IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

APRIL 1999 SESSION



FILED

July 15, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9805-CR-00203 |
| | ) | |
| vs. | ) | Davidson County |
| | ) | |
| SCOTTY EUGENE WALKER, | ) | Hon. Thomas Shriver, Judge |
| | ) | (at trial) |
| Appellant. | ) | Hon. Steve R. Dozier, Judge |
| | ) | (at motion for new trial and motion for judgment of acquittal) |

(Aggravated Child Abuse)

FOR THE APPELLANT:

**JEFFREY A. DeVASHER**  (on appeal)
**LAURA C. DYKES** (at trial)
**JAMES HOLT WALKER** (at trial)
Asst. District Public Defenders
1202 Stahlman Bldg.
Nashville, TN  37201

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**ELIZABETH B. MARNEY**
Assistant Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN  37243-0493

**VICTOR S. JOHNSON, III**
District Attorney General

**DIANE LANCE**
**WILLIAM REED**
Asst. District Attorneys General
222 Second Ave. North, Ste. 500
Nashville, TN  37201-1649

OPINION FILED:_____

**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

## OPINION

The defendant, Scotty Eugene Walker, appeals from the conviction of aggravated child abuse he received at the conclusion of a jury trial in the Davidson County Criminal Court. He is presently serving a nineteen year sentence in the Department of Correction for this Class A felony. In this appeal, Walker raises several issues for our review:

1. Whether the trial court erred in denying Walker's motion to suppress his statements.
2. Whether the evidence is sufficient to support a finding of Walker's guilt beyond a reasonable doubt.
3. Whether the trial court properly admitted photographs of the victim depicting her injuries.
4. Whether the trial court properly denied Walker's request for a mistrial when an expert witness changed her opinion during the trial regarding aging of the victim's bruising.
5. Whether the trial court properly sentenced Walker.
6. Whether a new trial should have been granted based upon newly discovered evidence of the victim's and her twin's recurrent nightmares between 2:00 and 2:30 a.m.

Having reviewed the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

This case arises from a devastating closed-head injury suffered by Brittany DeSheles, a two-year-old child.[1] Brittany and her twin sister Kayla are the children of Tina Hunt. In March 1995, the children lived with Ms. Hunt and her roommate, Shannon Hendrix, in a rental duplex. Ms. Hendrix had a toddler son who lived in the home, as well. The defendant was Ms. Hunt's boyfriend, and Ms. Hendrix was romantically involved with Jesse Hall.

Around 8:00 to 9:00 p.m. on March 20, 1995, the defendant went to the Hunt/Hendrix home. When he arrived, Hunt and her children, Hendrix and her child, and Hall were present. The adults drank beer and took drugs. The defendant

---

[1]The facts are recited in the light most favorable to the state.

consumed a quart of beer and Soma, Klonopin and Valium pills.

Eventually, Hendrix and Hall left the home with a friend. They returned about 10:30 p.m. They found the defendant and Hunt holding the victim and putting ice on a large knot on the victim's head. This was the only injury visible on the victim. Hunt talked by telephone to a physician at Vanderbilt Hospital emergency room about the victim's injury. After the victim fell asleep, the defendant and Hunt left with Melissa Jones and Mark Johnson. Hunt asked Hendrix to watch the victim and her twin sister while she was gone.

Around 1:30 or 2:00 a.m., Andy Champion arrived and Hall departed with him. Hall checked on the victim, and he observed her only injuries were a knot and a bruise. Hendrix also checked on the victim, who was asleep in Hunt's bedroom, then locked herself in her bedroom and went to sleep. After Champion and Hall departed, Hendrix was the only adult left in the home.

The defendant and Hunt returned to the house sometime around 4:00 to 4:45 a.m. Hall returned to the Hunt/Hendrix home around 4:15 to 4:30 a.m. When he arrived, the defendant was in the bathroom with the water running. Hall heard the defendant yell for Hunt. He saw the defendant cross the hall with the victim in his arms, and he heard Hunt begin screaming. He then saw Hunt holding the victim, who had a badly bruised face, a cut on her chin and difficulty crying. Hall called Mark Johnson's home to have someone come to take the victim to the doctor. When he returned to the area of the home where the defendant and Hunt had the victim, he observed thick, dark blood coming from the victim's nose. Hall then called 9-1-1.

Michael Cayll, a paramedic, received a call at 4:45 a.m. to respond to

3

the Hunt/Hendrix home. He arrived at the residence at 4:47 a.m. Firefighters were already administering oxygen to the victim, who was having seizures. The victim's physical symptoms were indicative of a serious head injury. Cayll recalled a male and a female present on the scene whose demeanor did not correspond with the gravity of the situation.

Around 5:00 a.m., Hendrix was awakened by Hall and a police officer beating on her bedroom door. Hendrix had been asleep in her room since Hall's departure from the home several hours earlier.

The defendant was taken to the criminal justice center, where he was questioned. The then-eighteen-year-old defendant, who dropped out of school in the tenth grade and who had not slept all night, waived his Miranda rights. He was interviewed off and on over the course of the next several hours. At first, the defendant claimed the victim had fallen out of his arms while he was rearranging her bed covers and hit her head on a bed rail and the floor. He claimed this occurred earlier in the evening before he, Hunt and Jones left the house. Later, he admitted that he became frustrated with the victim's fighting, biting, scratching and screaming while he was trying to get her to sleep. The defendant said he hit the victim on the back of the head. He said he hit her "a couple of times" but later that it was "only once." The defendant's admission that he hit the victim came after an exchange in the interview in which he indicated his desire to take the blame for the victim's injuries so that the Department of Human Services would not remove the victim and her twin from Tina Hunt's custody. When the defendant was confronted with information that medical personnel had opined the victim's head injury was caused by greater trauma than that he had described, he denied shaking the victim and said he had hit her only once with his fist. Throughout his statement, he denied knowledge of a cut on the victim's chin.

4

Doctor Rachel Mace examined the victim at Vanderbilt Hospital on March 21, 1995. The victim had extensive facial bruising, a fresh cut on her chin and a head injury. The victim was in a coma and having seizures. She had significant brain swelling, bleeding inside the head, and a skull fracture. Her injuries were life threatening, and the victim probably would have died without medical intervention. Doctor Mace opined that the victim most likely would have begun having seizures or become unconscious immediately upon receiving such a severe injury. The victim also had retinal hemorrhages, which were consistent with shaken baby syndrome. Doctor Mace opined that the victim's injuries were not accidental in nature and had been inflicted by severe trauma. Further, according to Dr. Mace the victim's injuries were the result of more than one impact. Doctor Mace opined that the victim had been a victim of child abuse.

Doctor Leonard Steinberg, the victim's pediatrician from February 1994 until June 1996, and Vickie Allen, the victim's great aunt, testified about the effect of the injuries on the victim and the extent of her disability.

The trial court submitted count one, aggravated child abuse, based upon the head injury and intercranial bleeding, and count two, assault, based upon bruises to the left side of the head and the forehead,[2] to the jury. The jury found the defendant guilty of aggravated child abuse on count one and not guilty of assault on count two.

---

[2]The trial court partially granted the defendant's motion for judgment of acquittal on count two. The court ruled that the state failed to prove aggravated child abuse, child abuse, aggravated assault or reckless aggravated assault with respect to the injury that formed the basis of count two. However, the court found that the state had presented evidence from which the jury could find the defendant guilty of assault and allowed the jury to receive the question of assault on count two.

Against this factual backdrop, the defendant has filed this appeal.

I

In his first issue, Walker alleges the trial court erred in denying his motion to suppress the statements he gave to law enforcement officials on March 21, 1995. Specifically, Walker claims his statements were involuntarily made because they "were the product of Detective Meek's threat to him that Tina Hunt would lose custody of her children unless the defendant provided Meek with an explanation consistent with the victim's injuries."

A trial court's determination that a confession has been freely and voluntarily given is not subject to reversal on appeal unless the evidence preponderates to the contrary. See State v. Odom, 928 S.W.2d 18, 23-24 (Tenn. 1996). Thus, the credibility of witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are within the province of the trial court as the trier of fact. See id. On appeal, the appellant must shoulder the burden of demonstrating that the evidence preponderates against the trial court's findings. State v. Kevin Tate, No. 02C01-9605-CR-00164, slip op. at 16 (Tenn. Crim. App., Jackson, Dec. 3, 1997) (citation omitted), perm app. denied (Tenn. 1998).

The defendant was interviewed at the criminal justice center over the course of several hours on March 21, 1995. The first interview commenced at approximately 7:00 a.m. The last interview ceased around 1:00 or 2:00 p.m., at which time the defendant was arrested and booked into the jail. There were three interviews, which totaled approximately one and one-half hours' time. Initially, the defendant persisted in explaining the victim's injuries as the result of an accidental fall. Later, he acknowledged that his previous representations had been false and explained he had lied in order to keep the Department of Human Services from

6

removing the victim and her sister from Tina Hunt's custody. On multiple occasions, he expressed his concern that Hunt would lose custody of her children. During the second interview, Walker asked the detective what was going to happen. The detective responded,

> More than likely you're going to get arrested for aggravated child abuse . . . if she lives. If she dies, you're looking at murder charges. . . . And if you don't tell me the whole truth, the kids are going to be taken away from Tina. If you tell me the whole truth, she may even be able to keep the children.

Almost immediately thereafter, the defendant responded, "Well just f--- it. I'll take the blame . . . all of it. Lock me up for the rest of my f------ life." The detective maintained he just wanted the truth and reminded Walker that the victim was near death. Walker responded, "I know, but I did not do that! The death . . . the death . . . the near death could be caused from where she hit her head on the bed not from where somebody hit her or beat her up." The interview continued with Walker detailing his having hit the victim and Hunt's lack of knowledge of his actions. Shortly before the second interview terminated, the detective said, "Now, I just want to make it clear, I haven't forced you to say this?" Walker responded, "No, you haven't. You've been real nice and I appreciate it." In the third and final interview, there was no mention of the possibility that Hunt might lose custody of her children.

The record on appeal does not contain a transcription of the trial court's findings on the motion to suppress. Rather, the record reflects only that the motion was denied. This court is reluctant to place a trial court in error where the party seeking relief has failed to provide us with a record that reflects the trial court's basis for its ruling. See Tenn. R. App. P. 24(b) (appellant's duty to provide a record that conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues on appeal). In any event, despite the deficiency, the facts of the case do not demonstrate a basis for disturbing the trial court's ruling.

7

The defendant argues that his confession should be suppressed as involuntary because he would have said anything, including making inculpatory admissions, in order to keep DHS from removing Tina Hunt's children from her custody. He relies upon Lymumn v. Illinois, 372 S.W.2d 528, 83 S. Ct. 917 (1963), in which the Supreme Court held a mother's confession involuntary where she was threatened with loss of custody of her children and of welfare benefits. We find the facts of this case distinguishable in degree from those in Lymumn.

In this case, the child custody situation did not involve children with whom Walker himself had a parental, or even official custodial, relationship. The detective emphasized to Walker that he wanted him to tell the truth. After Walker's "I did it" outburst, he and the detective talked in detail about what Walker had actually done, and Walker denied the most serious injury. When Walker was specifically asked whether he felt coerced, he indicated he did not and thanked the detective for being nice. Finally, Walker gave another statement later the same day in which he did not recant his admission of wrongdoing. Thus, the record provides a basis for upholding the trial court's denial of the motion to suppress. See State v. Carolyn Wallen, No. 03C01-9210-CR-00345 (Tenn. Crim. App., Knoxville, July 13, 1993) (mother who was told while she was in custody for two and one-half hours that her child was with a babysitter, that she could lose custody of her child as the result of her participation in two aggravated robberies, and who was asked to cooperate for the welfare of her child did not give involuntary confession).

## II

Walker claims his conviction is infirm because the evidence does not support his guilt beyond a reasonable doubt. Specifically, Walker contends that the proof does not exclude every reasonable hypothesis other than his guilt because Shannon Hendrix could have inflicted the victim's head injury during the early

8

morning hours when Hendrix was the only adult present in the home with the children.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779

9

(Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

In the light most favorable to the state, the evidence supports the guilt of the defendant and no one else as the perpetrator of the crime. Doctor Mace opined that given the severity of the victim's skull fracture and internal head injury, the injuries were sustained within a few hours of the victim's presentation at the hospital, and the likelihood increased closer in time to presentation as contrasted with the earlier hours in the evening. The defendant admitted striking the victim, although he denied more than one or two blows or shaking the victim. Throughout his statements, he consistently maintained that Tina Hunt had nothing to do with the victim's injuries. Despite his efforts at trial to cast the shadow of guilt upon Shannon Hendrix, the state's evidence demonstrated that the victim had no massive injury when Hendrix went to bed around 1:30 to 2:00 a.m. Hendrix remained locked in her bedroom asleep for the rest of the night and did not awaken until Hall and a police officer pounded on her door the following morning.

In finding the evidence sufficient, we have distinguished State v. Hix, 696 S.W.2d 22 (Tenn. Crim. App. 1984), overruled on other grds., State v. Messamore, 937 S.W.2d 916, 919 n.3 (Tenn. 1996), upon which the defendant relies. In Hix, the victim's mother and father were both found guilty of child abuse.

10

Id. at 23. This court found the evidence insufficient to support their convictions where the evidence showed that the child was in the custody of both parents at the time of his injuries. Id. at 25. Although the parents offered various explanations for how the victim's injuries could have occurred, they made no significantly inculpatory statements. Id. In the present case, however, the state's evidence demonstrated that the defendant inflicted the victim's injuries during the hours in which Shannon Hendrix was locked in her room asleep. The defendant offered no evidence to the contrary. Moreover, the defendant admitted harming the victim, although he denied inflicting the most severe of the injuries. He repeatedly denied that Tina Hunt had any knowledge of or involvement in the abuse.

Thus, the evidence sufficiently supports the defendant's conviction.

### III

Next, the defendant complains of error in the admission of five photographs of the victim which depict her injuries.

In determining whether photographs should be admitted, the trial court must determine, first, whether the photograph is relevant. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); Tenn. R. Evid. 401. Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973); see also State v. Terrence L. Davis, No. 02C01-9512-CR-00343, slip op. at 14 (Tenn. Crim. App., Jackson, June 2, 1997), perm. app. denied (Tenn. 1998). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the jury. Banks, 564 S.W.2d at 951; see Tenn. R. Evid. 403 (relevant evidence may be admitted if its probative value is not "substantially outweighed by

11

the danger of unfair prejudice").  Prejudice becomes unfair when the *primary* purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror."  M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986).

On appeal, a trial court's decision to admit a photographic exhibit is reviewable for abuse of discretion.  Id. at 949.

The five photographs in question are of the victim's head and face at various angles.  There is one photograph each of the left and right sides of the victim's head, the victim's face from above, the victim's face from the left side, and the victim's face from below.  The photographs depict significant bruising in diffuse areas of the victim's forehead and face, as well as a sutured chin laceration.  The defendant specifically attacks three of the photographs, which depict bruises to the right side of the face and the eyes, and the chin cut, because he was not charged with inflicting these injuries.

The trial court significantly curtailed the quantity of photographic evidence the state was allowed to introduce.  It did not allow the state to use an overhead projector to display the images to the jury because the projector "change[d] the colors . . . in an impermissible way."  The photographs the court allowed of the victim's external facial and head injuries were relevant to the victim's internal skull fracture and intercranial bleeding as charged in count one, as well as the bruises that were the subject of the second count of the indictment.

Upon review, we find the photographs relevant and lacking danger of unfair prejudice.  Doctor Mace opined that the skull fracture and the intercranial bleeding had not necessarily resulted from the same blow.  Moreover, she opined

12

that the victim's internal head injuries were the result of non-accidental, severe, inflicted trauma.  Doctor Mace testified that the various bruises on the victim's face and head and the chin cut were indicative that acts of child abuse had been inflicted, rather than a simple fall or one blow.  Although the defendant was not charged with a separate count for each individual injury, the victim's overall physical condition was relevant to cast doubt upon his statements that the victim had fallen and he had hit her only one or two times.  We believe the photographs were properly received for this purpose.

Alternatively, the defendant argues that even if probative, the photographs were too prejudicial to be admitted.  We acknowledge that the five challenged photographs are disturbing in that they depict a badly injured young child attached to medical tubes and wires.  However, they are not gruesome or so graphic that they should have been excluded.  Unlike the photographs of which this court disapproved in the cases cited by the defendant, the photographs in the case at bar were not autopsy photographs. See State v. Collins, 986 S.W.2d 13, 19-22 (Tenn. Crim. App.) (photographs of newborn baby taken at autopsy were erroneously admitted because of inherent prejudice and lack of probative value to facts in issue), perm. app. denied (Tenn. 1998); State v. Cynthia Roberson, No. 02C01-9503-CC-00059 (Tenn. Crim. App., Jackson, Dec. 28, 1995) (five photographs showing child abuse victim's injuries were properly admitted but one autopsy photograph depicting victim's head after dissection and exposure of internal features improperly admitted) (Summers, J., dissenting); Gladson v. State, 577 S.W.2d 686 (Tenn. Crim. App. 1978) (autopsy photos showing decedent's cranial bone and brain).  Moreover, it is noteworthy that the defendant was charged in count two with assault based upon the bruises on the left side of the victim's face. Despite receiving the photographs of these bruises, the jury chose to acquit the defendant on that count.  This tends to indicate that the jury did not misuse or

otherwise become inflamed by these photographs.

We find no abuse of discretion in the admission of the photographs.

**IV**

Walker also alleges that the trial court erred in denying his motion for a mistrial. Prior to trial, the defense interviewed Dr. Rachel Mace, a pediatrician who examined the victim during her hospitalization and determined that her injuries were the result of non-accidental child abuse. During pretrial interviews with the defense, Dr. Mace indicated that the victim had bruises of various ages on her body. Based upon this information, the defense apparently planned to cast doubt upon the state's theory that the defendant inflicted the charged injuries on the victim by showing that he was not present in the victim's home when earlier injuries had been inflicted.

After the state had commenced its case-in-chief, the court held a jury-out hearing regarding the admissibility of photographs at which Dr. Mace testified. During this testimony, she testified that she was unable to give opinions regarding the ages of the victim's various bruises. Doctor Mace said she had changed her mind that morning about the accuracy of gauging the age of bruises by color after reading an article in the journal Pediatrics. The defense registered a vociferous objection and asked the court to declare a mistrial. After an *ex parte*, in-chambers, and off-the-record hearing was conducted with the defense and over the objection of the state, the court declined to grant a mistrial. However, the court adjourned court for the day so that the defense would have time to prepare for cross-examination of Dr. Mace. The court acknowledged "a fairly serious discovery problem" and indicated its willingness to give the defense as much time as it needed to prepare. When defense counsel was specifically asked when she would like to

14

return, she indicated she would be ready to proceed at 10:30 the following morning. When court resumed the following morning, the defense did not indicate a lack of preparedness or ability to proceed.

The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record. Id.

On appeal, Walker claims that he was forced by this change of opinion to defend against a theory of the case that had not been advanced by the state prior to Dr. Mace taking the stand. Further, he claims the denial of a mistrial made it impossible for him to obtain an expert witness. Finally, he cites to the caselaw of this court and the Tennessee Supreme Court which condemns "trial by ambush."

The weakness in Walker's argument is that the trial court indicated its willingness to provide the defense with as much time as it needed to prepare, rather than granting a mistrial. In the wake of the denial of the motion for mistrial, the defense indicated it could be prepared the following morning and registered no request for additional time when court reconvened. The defense did not indicate to the trial court that it needed more time to obtain an expert witness. It appears from the record that the trial court would have been as accommodating of the defense as the situation warranted. We fail to see how the procedure followed in lieu of the grant of a mistrial resulted in a miscarriage of justice to the defendant's detriment. See id. As such, we see no abuse of discretion in the trial court's denial of the motion for mistrial.

15

**V**

The defendant's next issue is whether he received an excessive sentence. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. §40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." Id. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo.* Id. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §40-35-210(a), (b) (1997); Tenn. Code Ann. §40-35-103(5) (1997); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

16

The defendant's first specific complaint about the length of his sentence is that the trial court did not apply as a mitigating factor the defendant's lack of a prior criminal record. This court has, indeed, held that this is a proper mitigating factor under Code section 40-35-113(13). See, e.g., State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995). In the present case, however, the defendant had a history of illicit drug use and underage alcohol consumption. We see no error in the trial court's failure to reward him with a mitigating factor because he was fortunate or surreptitious enough to avoid prosecution for his illegal activity. See State v. Williams, 920 S.W.2d 247, 261 (Tenn. Crim. App. 1995) (trial court may, but is not required to, consider lack of prior criminal record as a mitigating factor).

The defendant also complains about the trial court's enhancement of the defendant's sentence by two years for each enhancement factor and reduction by one year for each mitigating factor. In State v. Boggs, 932 S.W.2d 467 (Tenn Crim. App. 1996), this court observed

> The appellant's sentence is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years. Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. . . . 'The Legislature has provided for only ranges within which a determinate sentence will be imposed and has not chosen to assign any controlling value to these mitigating and enhancement factors in how they are weighed in determining where within the appropriate range a particular defendant's sentence should fall.'

Id. at 475-76 (quoting State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986)) (other citations omitted). Neither Boggs, Moss, nor any other authority cited by the defendant stands for the proposition that a trial court may not assign specific values to enhancement and mitigating factors based upon the facts of the case. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Comments (1997). Upon a complete

17

review of the sentencing proceedings, it is apparent that the trial court proceeded according to the principles and within the guidelines of the sentencing law.

We find no merit in the sentencing issues raised by the defendant.

## VI

Finally, Walker alleges he should have been granted a new trial based upon newly discovered evidence. At the motion for new trial, the court received evidence that the victim and her sister experienced recurrent nightmares between 2:00 and 2:30 a.m. Walker alleges this information casts doubt on his conviction because the nightmares may be indicative of the time of night Brittany was abused. By all accounts, the only adult present in the Hunt/Hendrix home at 2:00 or 2:30 a.m. on March 21, 1995 was Shannon Hendrix.

It is within the trial court's discretion to grant a motion for new trial on the basis of newly discovered evidence. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983). In order to prevail on such a motion, the defendant must demonstrate reasonable diligence, materiality and likelihood of a different result if the evidence is produced and accepted by the jury. Id. at 358-59.

The weakness in the defendant's argument is that he failed to carry his burden of proof at the motion for new trial. Although there is evidence of the victim's and her sister's nightmares in the record, the defendant has failed to establish the relevance of this evidence to a defense that Hendrix committed the crime.

That the victim's and her sister's nightmares have any relevance to the time of the victim's injuries can be no more than conjecture without some evidence

18

linking the nightmares to the time of the injuries. The defense proof at the motion for new trial was notably absent of any expert testimony that children may have sleep disturbances at the same time of night when they have suffered or witnessed a traumatic event. There was no showing of materiality of this evidence or the likelihood of a different result. Thus, there was no error in denying the defendant a new trial.

In sum, we find no error of law requiring reversal. The judgment of the

trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
DAVID H. WELLES, JUDGE