# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
February 26, 2008 Session

## STATE OF TENNESSEE v. TIMOTHY LEE DEMERY

**Appeal from the Circuit Court for Carter County**
**No. S-15952     Robert E. Cupp, Judge**

---

**No. E2007-00767-CCA-R3-CD - Filed July 25, 2008**

---

Appellant, Timothy Lee Demery, was convicted by a Carter County Jury of second degree murder. As a result, he was sentenced to twenty-three years in incarceration. After the denial of a motion for new trial, Appellant initiated the appeal herein. On appeal, he argues that the trial court improperly denied the motion for new trial on the basis of newly-discovered evidence that exonerated Appellant and was withheld from the defense during trial. We determine that the trial court did not abuse its discretion in denying a new trial on the basis of newly-discovered evidence and, therefore, affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Collins Landstreet, Elizabethton, Tennessee, for the appellant, Timothy Lee Demery.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Joe Crumley, District Attorney General; and Ken Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On November 4, 2002, Appellant was indicted by the Carter County Grand Jury for the first degree murder of the victim, David Harmon. At trial, the State's theory was that Appellant was in a dispute with the victim about some missing tax refund money. The State sought to prove that Appellant confronted the victim about taking the money and killed the victim with premeditation. Appellant's theory at trial was that a man named Willie Canova stole the money and that Appellant was attacked on the night of the victim's death at Appellant's trailer by Mr. Harmon, Mr. Canova,

and a third man. Appellant sought to prove that he was acting in self-defense when he shot Mr. Harmon seventeen times.

At trial, Appellant's wife testified that Appellant was angry when he discovered that someone stole some of his tax refund money. At the time, Appellant and his wife were experiencing marital difficulties. Appellant was living with his first cousin, Harold Bishop, Jr. Mrs. Demery was allegedly having an affair with a man named Jeff Grimes. Just prior to the victim's death, Appellant told Mrs. Demery and the couple's daughter to go stay with Mr. Grimes. According to Mrs. Demery, Appellant later told her that he had confronted the person who stole the money and that everything was worked out.

Appellant claimed that during the late night of March 13, 2002, or early morning of March 14, 2002, he was hanging out at the trailer in which he lived with the victim. The two men drank alcohol and smoked marijuana that was laced with cocaine. Appellant claimed that when he told Mr. Harmon that he was going to "whip" Mr. Canova, an altercation broke out between the two men. Shortly thereafter, Appellant claimed that the door of the trailer was broken open, and he was attacked by Mr. Canova and a man named "Little Chris." Somehow, Appellant managed to forcibly push Mr. Canova and "Little Chris" out of the trailer. The altercation between Appellant and Mr. Harmon continued.

Appellant testified that during the altercation, both he and Harmon had a gun. Appellant had a .22 caliber semi-automatic rifle and Harmon had a .25 caliber automatic pistol. Appellant admitted that he shot Harmon with the rifle while Harmon was trying to unjam his gun. Appellant then stated that he "unloaded" his gun on the victim. Appellant hesitated several seconds between each shot, but when Harmon raised his gun at Appellant, Appellant shot him. Appellant testified that he reloaded the gun after he shot Appellant but that he did not intend to kill the victim. Instead, Appellant argued that he meant to kill Mr. Canova.

After Appellant shot Mr. Harmon multiple times, Appellant claimed that he hid out in the bathroom, smoking cigarettes and drinking vodka. He was afraid to go out of the trailer because he thought he would be attacked by Mr. Canova and the man he described as "Little Chris."

The next day, at around 7:40 a.m., Rachel Holly saw Appellant running from a Mazda pickup truck that was parked in the parking lot of Clifton View Baptist Church. Harmon's body was found in the back of the pickup truck later that afternoon. The victim had sustained sixteen gunshot wounds to the body and one gunshot wound between the eyes.[1]

Gigi Berry, who lived several blocks away from the church, testified that she had an encounter with Appellant around 8:00 a.m. to 9:00 a.m. on March 14, 2002. According to Ms. Berry, Appellant appeared at her doorway and asked for a shirt. He was sweating profusely and

---

[1]While Appellant admitted that he shot the victim multiple times, he maintained that he did not shoot the victim between the eyes.

holding a shirt in his hands. Ms. Berry provided Appellant with a shirt. Appellant promptly removed his pants and threw his pants and the shirt that he had been holding into a trash bag at Ms. Berry's house.

Harold Bishop, Jr., Appellant's first cousin, testified that he received a call from Appellant on March 14, 2002, in which Appellant admitted that he shot "Dave" and left the body in the church parking lot. Appellant admitted that he gave this information to his cousin. Appellant testified, however, that he did not remember placing Harmon's body in his truck or driving his truck to the church. Sometime later in the day on March 14, 2002, Appellant admitted that he took a shower to get the blood off of his body and that he shaved his head.

At the conclusion of the jury trial, which took place on April 26-29, 2004, Appellant was found guilty of second degree murder.[2] Appellant was sentenced on March 3, 2005, as a violent offender to a twenty-three year sentence in the Department of Correction.

After sentencing, counsel for Appellant filed a motion for new trial on March 31, 2005, in which he argued that the evidence was insufficient to support the conviction. The motion was later amended on April 6, 2005, to add additional grounds for relief including, *inter alia*, that newly-discovered evidence required Appellant to be granted a new trial. The trial court held several hearings on the amended motion that occurred on April 7, 2006, September 6, 2006, and March 12, 2007.[3] At the hearing on April 7, 2006, the trial court summarily denied all grounds for relief with the exception of the issue of newly-discovered evidence. In that regard, Appellant argued that he should receive a new trial because the victim's father allegedly presented exculpatory information to the State prior to trial that was never provided to the defense.

At the second hearing on the motion, held on September 6, 2006, the victim's father, Jimmie Harmon, presented testimony to support the motion for new trial on the basis of newly-discovered evidence. Mr. Harmon confirmed that his son was the victim in this case. Some time during the proceedings in the case, he and his ten-year-old son were having breakfast at Hardee's on North Roane Street when Mr. Harmon heard a voice that he recognized. He looked around the restaurant and he saw Mr. Canova and a man that Mr. Harmon knew as "Little Chris."[4] According to Mr. Harmon a third individual named "Roger" accompanied the two men that he knew.

---

[2]The State initially argued on appeal that the trial transcript was not part of the record and that Appellant waived consideration of any issue that requires review of the transcript. After the State filed its initial brief, this Court granted a motion on March 11, 2008, allowing Appellant to supplement the appellate record with the trial transcript. After the trial transcript was filed with this Court, the State filed a supplemental brief.

[3]It appears from the record that the length of delay between the trial, the filing of the motion for new trial, and the hearing on the motion for new trial is, in part, attributable to the trial court's decision to relieve trial counsel shortly after trial. New counsel was appointed who, according to the trial court, "took . . . some period of time to get up to - - to par" on the case.

[4]As the testimony at trial revealed, these men were alleged by Appellant to have attacked him on the night of the victim's murder.

Mr. Harmon testified that the men could not see him because they were separated by a partition between the booths. Mr. Harmon heard one of the men say, "Did you see the expression on old Dave's face last night?" Mr. Harmon also heard them say that "David claimed that he changed his life and what better place for him to be than at the church." Mr. Harmon also heard the men discuss a "rumble." Mr. Harmon confirmed that his son's body was found in the back of a pickup truck in a church parking lot later that same day. Mr. Harmon did not confront the men at the restaurant.

Mr. Harmon claimed that he informed General Ken Baldwin, one of the prosecutors, about what he overheard. Mr. Harmon was uncertain at what point in the trial process he informed General Baldwin about the information, but he knew that it was prior to trial. Mr. Harmon stated that General Baldwin told him that the information could not be used because it was hearsay. Mr. Harmon testified that he did not relay this information to anyone else.

Mr. Harmon gave conflicting testimony about the timeline leading up to trial and when he relayed his information to various individuals. Mr. Harmon acknowledged that he submitted a written statement on April 7, 2006, in which he claimed that he heard the conversation "a few days after David was killed." Then, Mr. Harmon admitted that he did not hear the conversation the day that his son's body was found. Mr. Harmon then stated that he informed General Baldwin about the whereabouts of the men who made the statements after the first hearing in the case. Later during cross-examination, Mr. Harmon stated that General Baldwin was in the process of jury selection when he approached General Baldwin with the information. Mr. Harmon admitted that it was possible that the men were talking about someone other than the victim.

Assistant District Attorney General Mark Hill testified that he was in charge of the preliminary hearing and arraignment of Appellant's case. General Baldwin was not involved in the case at that time and was not even present during that stage of the proceedings. General Hill did not remember ever having a conversation with Mr. Harmon and denied that Mr. Harmon gave him any information about a conversation that he had overheard at Hardee's.

Johnny Blakenship with the Carter County Sheriff's Department also testified at the hearing. Mr. Blakenship assisted in the investigation of the murder of the victim. He was approached by Mr. Harmon about the conversation that was overheard at Hardee's. At that time, Mr. Harmon told Mr. Blankenship that General Baldwin and defense counsel were aware of the information. Another one of the investigators, Randy Bowers, testified at the hearing. Mr. Bowers met with Mr. Harmon several times prior to trial. He spoke with Mr. Harmon first on May 19, 2006. Mr. Harmon relayed the information about the allegedly "exculpatory" conversation to Mr. Bowers. Mr. Bowers was under the impression that the conversation was overheard a few days after the murder.

General Ken Baldwin, the trial prosecutor, took the stand as a witness and made a statement to the trial court. General Baldwin testified that the conversation between him and Mr. Harmon "didn't happen." General Baldwin insisted that he "would never not divulge such information" if it occurred but that Mr. Harmon simply did not approach him with that information.

The trial court ruled as follows:

I find it rather incredible that Mr. Harmon did not tell [counsel for Appellant] at that time about this. I mean, he's the one who's representing [Appellant], and you would think that - - he says he told General Baldwin. Of course that would prove not true. And of course we all have memory lapses. I'm not stating or would I state under any circumstances that Mr. Harmon has purposely lied to this court about anything because I don't think he has. I would find it incredible - - you've just got to look at these events - - that General Hill, if it was him who in fact received that information, that he didn't at least pass it on to General Baldwin and say, I just want you to know that the victim's father came up to me, . . . which is incredible. I mean, it's incredible. It's incredible to think that we're here this long because of the victim's father's testimony. That's the reason we're here. But I find it incredible that anybody in any position of authority in this case would keep information like that to themselves and not pass it on to General Baldwin. I find it also kind of rather incredible that we start at trial, and at no time, I mean, he's in here in essence testifying for [Appellant] today and did back when he was here the last time back in the fall I guess. So he's here testifying for him today. Then why in the world didn't he tell [counsel for Appellant] - - did you not understand? I mean, even after the state's testimony or some point that he didn't come to him and say, [l]et me tell you about this. He didn't do that. . . . And I think what bothers me more than anything is the physical facts in this case. It was from day one. They have - - General Baldwin reminded me this morning it was . . . sixteen (16) [times that the victim was shot]. With two different weapons . . . . The one shot being the one between the eyes. . . . This was from a distance of two (2) foot [sic] or less. And if you've shot somebody fifteen (15) times in all parts of their body, and that - - the autopsy showed that. I think at one time there was a number of actually how many times he was shot in the back. And then you've got to take [Appellant's] testimony in that regard too, . . . . The facts just doesn't [sic] support what Mr. Harmon says that - - he says that he overheard. If you take the logic even of Mr. Harmon's testimony and what they said in the light of the physical evidence in this case, that if those events had happened, . . . . I just feel that the evidence in this case is so overwhelming that it just disputes everything that Mr. Harmon stated in this court, and again, not because of any effort to deceive this court. I don't think Mr. Harmon would have done that. Incredible set of events when we're here because the victim's father says these events took place. So, I'm going to leave it alone . . . . The proof is overwhelming that [Appellant] committed this offense and committed it as the state contended he committed it. So your motion for a new trial is respectfully denied.

Appellant filed a timely notice of appeal in which he challenged the trial court's denial of his motion for new trial.

*Analysis*

-5-

On appeal, Appellant argues that the trial court erred by denying a new trial on the basis of newly-discovered evidence. Specifically, he argues that trial counsel could not have discovered the evidence through reasonable diligence because it was not communicated to him by the assistant district attorney. Further, Appellant argues that the evidence is "crucial to the determination" of Appellant's guilt. Moreover, Appellant argues that the evidence would "likely change the result of the trial." Finally, Appellant argues that the evidence was exculpatory and the State failed to provide it in violation of *Brady v. Maryland*, 373 U.S.83 (1963). The State counters that the trial court did not abuse its discretion.

As noted by Appellant, to receive a new trial on the ground of newly-discovered evidence, a defendant must demonstrate: "(1) reasonable diligence in seeking the newly-discovered evidence; (2) materiality of the evidence;" and (3) the likelihood that the evidence would change the outcome of the trial. *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994) (citing *State v. Goswick*, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Additionally, the decision regarding whether to grant or deny a motion for a new trial predicated on newly-discovered evidence "rests in the sound discretion of the trial court." *State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995). Moreover, the trial court is authorized to ascertain the "'credibility of newly-discovered evidence for which the new trial is asked,'" and the motion should be denied unless the court has assured itself that the testimony would be worthy of belief by the jury. *Id.* (quoting *Rosenthal v. State*, 292 S.W.2d 1, 5 (Tenn. 1956)). When it appears that the newly-discovered evidence can have no other effect than to "discredit the testimony of a witness at the original trial, contradict a witness' statement or impeach a witness," the trial court should not order a new trial "unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness was so strong and convincing that a different result at trial would necessarily follow. *State v. Rogers*, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985).

We find no abuse of discretion in the trial court's denial of Appellant's motion for new trial based upon newly-discovered evidence. The trial court found that the evidence was "incredible" and that the physical evidence was "overwhelming" in support of Appellant's guilt. We agree. Appellant testified at trial that he knowingly shot the victim multiple times. While he did not remember disposing of the victim's body, Appellant was seen running from the truck in the church parking lot where the victim's body was found. Appellant's defense at trial was that he shot the victim in self-defense. Moreover, as noted by the trial court, it is simply "incredible" that the victim's own father would not have relayed information to the Appellant's attorney that others may have been involved in his son's murder. We agree with the trial court that given the overwhelming proof of Appellant's guilt this information would not have changed the result of the trial.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE