IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 20, 2005 Session

## STATE OF TENNESSEE v. YOUNG BOK SONG, a/k/a MIKE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-C-1792     Steve R. Dozier, Judge**

_____

**No. M2004-02885-CCA-R3-CD - Filed November 4, 2005**

_____

The defendant, Young Bok Song, a/k/a Mike, was convicted by a jury of seven counts of rape of a child, a Class A felony, and four counts of aggravated sexual battery, a Class B felony, and received an effective sentence of sixty-five years, to be served at 100% in the Tennessee Department of Correction. On appeal, he argues the trial court erred by: (1) not appointing an interpreter; (2) not providing the defendant with a copy of a forensic interview tape; (3) allowing the State to ask the defendant numerous argumentative questions; and (4) not granting a new trial based on newly discovered evidence. Following our review, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Brent Horst, Nashville, Tennessee, for the appellant, Young Bok Song, a/k/a Mike.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian K. Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Following the State's election, the eleven counts which the jury considered and convicted the defendant were for the rape of a child occurring between September 8, 1997, and September 7, 2002, against the victim S.L.[1] (Counts 1, 2, 3, 4, 5, 6, and 7); aggravated sexual battery occurring between September 8, 1997 and September 7, 2002, against the victim S.L. (Counts 10, 11, and 12); and aggravated sexual battery occurring in April 2003, against the victim J.L. (Count 13). We will set out the trial testimony.

_____

[1]It is the policy of this court to refer to juvenile victims of sexual offenses by their initials.

## FACTS

The victim, S.L., born on September 8, 1989, and fourteen years old at the time of the trial, testified that she lived with her mother, Chong Suk Pak, and her younger sister, victim J.L., in a two-bedroom apartment in Nashville during the times the defendant had sexual contact with her. She testified that she did not know or have any memories of her biological father. S.L. said she met the defendant when she was very young and remembered him living with her family "for a little bit."[2] After the defendant moved out to live with his ex-wife[3] and children, S.L. visited him at his house a "couple of times a week," but also continued to see the defendant at her apartment because he often babysat S.L and J.L. while their mother was at work.

S.L. testified to a number of different sexual encounters with the defendant. S.L. said the first time she remembered the defendant having sexual contact with her was when she was about eight years old and her mother was at work. She said she was in her bedroom practicing her flute and her sister was in the living room when the defendant came into the room and "told [her] to take off [her] clothes." After taking off all her clothes, S.L. closed her eyes at the direction of the defendant and laid down on her back on the bed while his "penis went inside [her] vagina." S.L. said this hurt and she began to cry, but the defendant "told [her] to be quiet." S.L. said that "[a]fter [the defendant] finished, [he] told [her] to go wash [herself]," which she did. She said she did not yell for her sister because she was afraid of the defendant. S.L. could not remember how many times the defendant had raped her in her bedroom but said it happened more than twice.

The second incident occurred when S.L. was again in her bedroom practicing her flute and the defendant told her sister and his own daughter, Mindy, to go outside and play. S.L. did not remember how old she was at the time of this encounter. She said the defendant came into her room and told her to take off her clothes and then "put his penis into [her] vagina" while she was lying on her bed. She did not recall how long this episode lasted, nor did she remember if the defendant said anything.

The third sexual encounter occurred in her living room while S.L.'s mother was at work and her sister was asleep in the bedroom. She said the defendant told her to take off her clothes, and he then "[p]ut his penis inside [her] vagina" while she laid on the floor on her back. Asked if she ever said anything to the defendant when he told her to remove her clothes, S.L. said she "sometimes .

---

[2]There is some discrepancy as to whether the defendant is S.L. and J.L.'s stepfather. The victims' mother, Chong Suk Pak, who is Korean and spoke little English, testified that she and the defendant were "married by papers" in Nashville but were not married by a judge or a minister. The defendant, also from Korea, testified that he tried to become the victims' legal guardian, but when the government rejected his case, he decided to marry their mother "by paper." Not being familiar with the "marriage by paper" alone concept and not having a copy of the "marriage papers," we are unable to ascertain if the parties were legally married.

[3]The record is also not clear on whether the defendant, who left a wife and child in Korea, was divorced. Although the defendant testified that he divorced his wife before he left Korea, he began living with her once she immigrated to the United States and had more children. He also addressed her as his "wife" during his testimony.

. . said that [she] didn't want to do it," but he "still did it." S.L. said she felt pain during the rape and cried, but the defendant told her to be quiet. Asked how she knew her mother was at work, S.L. said that the defendant called her mother "before . . . to make sure that she was still there." S.L. said she had her eyes closed the entire time and did not know if the defendant had anything on his penis while he was raping her. S.L. could not remember how many times the defendant raped her in the living room but said it was more than once.

The fourth sexual encounter happened when S.L. was twelve years old and the defendant told her to go to her mother's bedroom. S.L. said the defendant "had a towel and he put it behind [S.L's] butt, and he told [her] to take off [her] clothes and stuff." The defendant then "put his penis inside [S.L's] vagina," which was "painful" and "made [her] bleed." Asked if the defendant did anything different compared to the other times he raped her, S.L. explained that "he did it more harder." Afterward, the defendant picked S.L. up and took her into the bathroom, put her in the bathtub, and told her to wash herself. S.L. said she continued to bleed the next day at school and used tissue to keep the blood from going anywhere. S.L. testified that this was the last time the defendant put his penis inside her vagina.

The fifth encounter S.L. recalled having with the defendant was at his house. She said he told her to take off her clothes and "help him scrub his back in the shower." S.L. could not remember what happened after she took off her clothes. The sixth encounter with the defendant occurred in the living room of S.L.'s apartment when the defendant, lying on the floor, told S.L. to "perform oral sex." S.L. said the defendant put "[h]is penis inside [her] mouth," and she "was sort of choking" because the defendant "was making [her] gag" as his penis "was going really deep" in her mouth. Afterwards, the defendant told S.L. to brush her teeth. S.L. testified that the defendant made her perform oral sex on him again in her bathroom while her mother, sister, and cousin were all home. She said he turned on the faucet and made her get on her knees and put his penis in her mouth. S.L. said the defendant made her gag because "[h]e was kind of pushing [his penis] really deep down in [her] throat or something."

In addition to these sexual encounters, S.L. described incidents when the defendant touched her breasts and buttocks. She explained that he squeezed her breasts and buttocks under her clothes on other occasions separate from the ones earlier described. S.L. said the defendant told her while squeezing her breasts that she "should be thanking him because it was making [her breasts] grow."

S.L. testified that the first person she talked to about what the defendant did to her was a friend at school. She said she told her friend after attending a school program that dealt with rape and hearing from a girl "talking about how she got raped." The friend told her teacher, Ms. Griffith, whom S.L. later talked to about the sexual encounters. S.L. said she did not tell anyone what happened to her before this because she was afraid of the defendant as a result of his hitting her and J.L. when they did not listen to their mother or do their school work. She explained that it was the defendant, not her mother, who disciplined her.

J.L., born October 31, 1990 and thirteen years old at the time of trial, testified that she did not remember how old she was when she first met the defendant but thought she was either in the first or second grade. She said she went to the defendant's house once or twice a month, and the defendant visited or babysat her and S.L. at their apartment while their mother worked. Asked if S.L. ever told her what happened with the defendant, J.L. said S.L. told her that he "raped" her in the living room. J.L. later told their mother what happened, and she "almost fainted." Asked if anything happened between her and the defendant, J.L. said when she was twelve he touched and squeezed her breast while she was in the bathroom of her apartment. She said the touching lasted a couple of seconds and made her a "little nervous." J.L. told S.L. about what had happened after S.L. confided in J.L. about what the defendant had done to her.

J.L. testified that the defendant disciplined her and S.L. and was more strict with them than their mother. She explained that he would strike them on the hands or the back of their legs with a metal stick. She said she never told her mother about the defendant hitting her because she was scared.

The victims' mother, Chong Suk Pak, who moved to the United States from Korea in 1985, testified through an interpreter. She divorced the victims' father in 1994 and he moved back to Korea sometime after that. Pak met the defendant in 1994 and he lived with her and the victims from May 1994 until March 1995, sleeping in her bedroom while she slept on the couch. Pak acknowledged having a romantic relationship with the defendant and said she did not know he had an ex-wife and children in Korea until after he began living with her. She said he told her that he was divorced. After the defendant's ex-wife and children moved to the United States in 1995, he lived with them but continued to come to Pak's apartment to babysit the victims. Pak acknowledged she continued her romantic relationship with the defendant until he moved to Alabama in 2002.

Pak said she allowed the defendant to babysit her children because she did not "trust anybody else, anyone else, to have [her] children's well-being." She "could not trust [her] ex-husband, but [she] trusted [the defendant]" with her children. Asked why she did not trust her ex-husband with the girls, Pak testified that "he often mention[ed] about sexual abuse of a father of their children; and, so, I just thought he . . . could not be trusted." She later explained that her ex-husband "watched TV and read . . . newspaper article about sexual abuse by parents, he . . . mentioned about those. So, when I heard him mentioning that, I began to doubt." She acknowledged that she did not know if her ex-husband had ever abused her children and the last time he saw the children was in 1993, when S.L. was four years old.

Pak testified that the defendant helped S.L. and J.L. with their homework and taught them music. Asked if she had seen the defendant strike her children, Pak answered that he "frequently" did so and described an incident when the defendant hit S.L. on the back of her leg with a stick. She acknowledged that striking children with a stick on their feet or back of their legs is typical punishment in Korea. Asked if she had ever questioned her daughters as to whether anything had happened to them while they were at the defendant's home, Pak answered, "I ask them if he didn't do anything. I ask that, because he is not their real father." She testified that S.L. never told her

about the defendant's abuse, that she learned about it from J.L., and that the news was a shock to her. Pak acknowledged that, after the defendant moved away, she often told her daughters that if they did not behave he would come back to discipline them.

Brenda Griffith, a teacher at John Trotwood Moore Middle School, testified that in May 2003, her class had just finished sex education classes. She said representatives from Mercy Ministries[4] talked to the class and acknowledged one of the speakers was a young girl who talked about being sexually abused but had not described the abuse in graphic detail. About a week later, representatives from the Rape and Sexual Abuse Center came to talk to her class, and soon after their presentation, S.L. told Griffith she had "been raped on numerous occasions, by a friend of her mother's." Griffith said S.L. seemed "very agitated and very nervous" and "upset" at the time.

Dr. Angela Latrice McShepard Carr, a former guidance counselor at John Trotwood Moore Middle School, testified that Ms. Griffith reported S.L.'s abuse to her and that she spoke with S.L. about what had happened with the defendant. On cross-examination, Dr. Carr could not recall if S.L. used the word "raped" when she talked to her. She acknowledged that S.L. did not describe the abuse in detail.

Dr. Maureen Sanger, a psychologist with Our Kids Center in Nashville, testified that she interviewed S.L. in June 2003 at the Center, which performs medical evaluations of children suspected of being victims of sexual abuse. The interview included S.L.'s medical history, which Dr. Sanger read to the jury. S.L. told Dr. Sanger that no one other than the defendant had ever touched her sexually, and she denied ever having any "peer sexual contact." On cross-examination, Dr. Sanger acknowledged that "[y]oung children oftentimes don't have clear memories that they're able to report verbally."

Carolyn Smeltzer, a nurse practitioner at Our Kids Center, testified that she performed a physical examination on S.L. Smeltzer explained that S.L. "had basically two areas on her hymen that . . . lacked any hymenal tissue" which "had to have been caused by some sort of a penetrating trauma, . . . something penetrated through her hymen and tore her hymen in both of those spots, all the way down to the base." Asked what could cause such an injury, Nurse Smeltzer said, "[W]hen we see kids with injuries to their hymen, that are talking about sexual abuse, they're typically talking about penile penetration to their . . . vaginal or genital area." Smeltzer acknowledged that such injuries can be the result of "an accidental penetrating injury, like a . . . straddle injury." Nurse Smeltzer testified that there is a difference in the depth of a child's hymen and explained that S.L.'s was "difficult to examine . . . because of the depth of her hymen; it was fairly in -- deep inside." Smeltzer said the injury to S.L.'s hymen would have taken approximately one week to heal, and she could not say when the injury took place. Asked if the injury could have taken place when S.L. was four or younger, Smeltzer said, "There's no way to be absolutely certain[,] but this is not -- the pattern of injury is not something that we commonly see in a young child." She further explained

---

[4]Griffith explained that Mercy Ministries is a private organization that offers counseling and education for young girls in need.

that when a younger child is sexually penetrated, "it's typically a fairly large injury . . . [the children] really come out with almost no hymenal tissue in a good part of the posterior pole."

Edward Stotts, a case manager for the Department of Children's Services ("DCS"), investigated S.L.'s allegation of sexual abuse by the defendant. Stotts told S.L. that she would be going to the Child Advocacy Center for a forensic interview and explained that a forensic interview is "basically an interview that's conducted for legal purposes."[5] Stotts said that S.L.'s forensic interview was tape- recorded. Stotts did not participate in S.L.'s interview but did interview J.L. who told him that the defendant had touched her breast. He said no medical examination was performed on J.L. because "there wasn't a disclosure of any type of penetration" with her.

On cross-examination, Stotts acknowledged setting up the forensic interview for S.L. after she told him she had been raped, but without receiving any details about the actual abuse. Regarding the taped forensic interview, Stotts acknowledged that S.L. was not admonished to tell the truth but did not know why.[6]

Detective Brett Gipson, with the Metro-Nashville Police Department Sex Crimes Unit, testified that he talked to S.L. "one or two times" but did not talk to J.L. because the DCS conducted the interviewing at the Child Advocacy Center. He said the defendant was eventually located in North Carolina where he was arrested.

Mindy Song, the defendant's daughter and twelve years old at the time of trial, testified that she had visited the victims' apartment but could not recall the defendant ever telling her and J.L. to play outside by themselves. She said she was sure about this because the defendant kept a very close eye on her to make sure she stayed safe.

The defendant testified that he came to the United States from Korea in December 1994, leaving behind his pregnant ex-wife and daughter. He said he met the victims' mother in Nashville and began living with her, acknowledging they were "lovers." He described his relationship with S.L. and J.L. as an "uncle" or "father" and said the victims' mother asked him to be the disciplinarian of the girls. He acknowledged the victims were afraid of him because he "had to use some corporal punishment and sometimes cry out, I'm yelling; sometimes give them some angry eyes," but when he was not disciplining them, they "were very close . . . just a father and daughters." The defendant denied sexually abusing S.L. and J.L. and maintained that the victims had lied, explaining, "If I do one sex with the children, her inside vagina will tore down."

---

[5]At the time of the trial, S.L.'s forensic interviewer, Pam Scretchen, no longer worked at the Child Advocacy Center and did not testify.

[6]At this point, the defendant admitted the forensic interview tape into evidence. The tape was later played for the jury with instructions that the tape was to be used solely to impeach S.L.'s testimony and not to be considered as substantive evidence.

# ANALYSIS

## I. Appointment of an Interpreter

The defendant argues that the trial court erred in denying his motion to appoint a Korean interpreter because of his inability to intelligently express himself in English. Specifically, he contends the trial court's failure to appoint an interpreter caused him to "not appear intelligent or reasonable and his demeanor appeared evasive" which denied him "his constitutional right to be heard." The State argues the defendant spoke and understood English well enough not to need an interpreter.

Tennessee Rule of Criminal Procedure 28 states: "The court may appoint an interpreter of its own selection and may fix the reasonable compensation of such interpreter." Tenn. R. Crim. P. 28. This court has previously explained:

> Tenn. R. Crim. P. 28 provides for the appointment of an interpreter by the court where it is deemed necessary. It is a discretionary matter for the trial judge in this State. Of course it is the duty of the court to provide the necessary means for the defendant to understand the nature of the charges against him, the testimony of the witnesses, and to communicate to the court. Failure to do so would be a violation of one's constitutional right to be heard, to know the nature and cause of the accusation, and to be confronted by the witnesses.

State v. Duc Le, 743 S.W.2d 199, 202, (Tenn. Crim. App. 1987) (citing 23 C.J.S. Criminal Law, § 965, p. 863, et seq.). As such, we utilize an abuse of discretion standard in reviewing a trial court's denial of appointing an interpreter. Thus, the determination of the trial court will be reversed only if it "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

The defendant cites eight portions of the trial transcript where his testimony was "indiscernible" to the court reporter. He also notes nine times where he had to ask for clarification of a question. However, when reviewing the trial court's decision not to appoint an interpreter, we must look at the information the trial court had to rely on in making its decision. At the pretrial hearing on the defendant's motion to appoint an interpreter, defense counsel noted that the defendant:

> is a Korean National. He speaks very good English, and I can sit down with him and understand him.
>
> But the problem is that numerous times, because of a heavy accent and he doesn't quite understand everything, not a hundred percent, I'll have to ask him to rephrase or vice-versa. And, so, it's difficult.

But I can communicate with him; so, I'm not asking for an interpreter for me to -- assist in my communication with him. My concern is in front of the jury.

And my concerns are that, because [the defendant] does not understand all words and phrases, if there's any misinterpretation, you know, maybe his . . . testimony might not be one-hundred-percent correct.

My other concern is that, if -- he does at times hesitate, trying to, it appears to me, translate in his own mind and then respond appropriately, concerned about the impression of the Jury that, well, why is he hesitating, is he trying to be evasive, that type a (sic) thing.

By defense counsel's admission, the defendant spoke "very good English" and did not need "an interpreter to assist counsel." Given this information, we cannot conclude the trial court abused its discretion in declining to appoint an interpreter for the defendant.

In addition, a review of the defendant's trial testimony reveals that he speaks English quite well and, we believe, was able to effectively communicate to the jury. At the motion for a new trial hearing, the trial court, noting that it had "observed [the defendant] during the trial," found "there's absolutely no question in the [c]ourt's mind, as [defense counsel] indicated to the jury, that [the defendant] . . . speaks very good English and understands English, and was able to respond to all the questions from the [d]efense attorney and the questions from the State in cross." Furthermore, the trial court found that the defendant was "attentive and interested, obviously, in what was being said and how the trial was proceeding." The defendant argues that he responded to some questions with "rambling lengthy answers." However, the trial court correctly noted that

it's not unusual for defendants, whether they're Korean-speaking or American-born, English-speaking citizens, to want to elaborate on their answers, maybe get far afield in their answers, in what is pertinent to a particular trial.

And, oftentimes, even those American-born, English-speaking witnesses have to be brought back, either with -- from their attorney, as was done in this case several times, or from the State, in requesting that [the defendant] answer the question. And he did that.

The trial court, from its unique position of observing the defendant while he testified, concluded it saw "nothing that transpired during the trial that would lead [the trial court] to believe [the defendant] needed an interpreter." Our reading of the defendant's testimony does not preponderate against this finding. This issue, therefore, is without merit.

## II. Forensic Interview Tape

The defendant argues the trial court erred in denying his motion to compel the State to provide him with a copy of the taped forensic interview of S.L., conducted at the Child Advocacy Center. The defendant argues he was entitled to a copy of this tape under Tennessee Rule of Criminal Procedure 16(a)(1)(D). The State argues that it was not required to give the defendant a copy of the tape, and, even if it were, the defendant was not prejudiced because the State made the tape available to the defendant to view whenever he needed.

Pretrial discovery of evidence is governed by Tennessee Rule of Criminal Procedure 16, which provides in pertinent part:

(a) Disclosure of Evidence by the State.

(1) Information Subject to Disclosure.

. . . .

(C) Documents and Tangible Objects. Upon request of the defendant, the State shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the State, and which are material to the preparation of the defendant's defense or are intended for use by the State as evidence in chief at the trial, or were obtained from or belong to the defendant.

(D) Reports of Examinations and Tests. Upon request of a defendant the State shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the State, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the State as evidence in chief at the trial.

(2) Information Not Subject to Disclosure. Except as provided in paragraphs (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal State documents made by the district attorney general or other State agents or law enforcement officers in connection with the investigation or prosecution of the case, or of statements made by State Witnesses or prospective State Witnesses.

Tenn. R. Crim. P. 16(a)(1)(C) & (D), (2). As such, Rule 16 allows for pretrial discovery of tangible objects and reports of examination and tests but prohibits the pretrial discovery of statements by state

witnesses. Tennessee Rule of Criminal Procedure 26.2 governs the discovery of witness statements. Rule 26.2(g) defines "statement" as:

> (1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness; or

> (2) a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof.

Tenn. R. Crim. P. 26.2(g). Under Rule 26.2, the State has no obligation to provide a defendant with a copy of a witness statement until after the witness has testified. Tenn. R. Crim. P. 26.2(a); State v. Taylor, 771 S.W.2d 387, 394 (Tenn. 1989) (holding that there is "no constitutional requirement that the State provide witnesses' statements prior to trial. The rule is clear that the State has no obligation to produce statements of a witness until the conclusion of the witness' testimony on direct examination.").

In his motion to compel discovery of the videotape, the defendant argued that it was "necessary to have a copy of the tape to adequately prepare for trial." At the hearing on his motion, he argued that he was entitled to a copy of the forensic interview tape because it was a "tangible" object:

> THE COURT: What about . . . your position on the tape?

> [DEFENSE COUNSEL]: Judge, I would submit that the discovery rules do require that it be turned over -- you know -- any tangible object. And it may be a videotape of an interview, but it is a tangible object.

> Furthermore, Judge, I just think it puts the State at an unfair advantage, in violation of due process . . . and fair trial requirements.

> . . . .

> THE COURT: Is there any difference between a written statement of a witness and an oral, recorded statement?

> [DEFENSE COUNSEL]: It's -- I would just say that it's a tangible object. I see the argument trying to compare it to a written report, but it's not a written report; it's a videotape, tangible object.
> If they're gonna (sic) videotape it–

> THE COURT: That is to be admitted in the State's case in chief.

[DEFENSE COUNSEL]: Right.

THE COURT: Well, they're not gonna [sic] be admitting a one-hour taped interview of the victim. It would be provided under the <u>Jencks</u> act and case law.

[DEFENSE COUNSEL]: Judge, if you have a videotaped interview, and all the nuances that go with that, you have the witness' demeanor on that tape.

It's -- it's not nearly as easy to take a videotape in the middle of a trial and try to do something with it, either pick out portions to cross-examine on, pick out portions to submit on your own case in chief, those types of things; it's a logistical nightmare, as opposed to a written report, where you can flip through it quickly.

That's my main concern, though, the logistics. You know, we may be in the middle of trial and I may have to ask this [c]ourt for a recess, for me to try to edit out the portions . . . that I may wanna [sic] play in my case in chief.

Apparently, the defendant was arguing that he should have a copy of the tape under Rule 16(a)(1)(C), which provides for discovery of tangible objects. In his motion for a new trial, the defendant renewed this argument, stating he should have been provided a copy of the videotape under Rule 16(a)(1)(C) because it was a tangible object and claimed the tape was essential in his ability to impeach the victim. It is only for the first time on appeal that the defendant argues that he should have received a copy of the videotape under Rule 16(a)(1)(D) because "a video tape of a forensic interview of an alleged child rape victim is as much of a result of a scientific test as it is a simple witness statement." As this court said in <u>State v. Alder</u>, 71 S.W.3d 299 (Tenn. Crim. App. 2001), "[i]t is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." <u>Id.</u> at 303 (citing <u>State v. Banes</u>, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993)). Thus, we conclude that, because of his changing theories between trial and appeal, the defendant has waived the argument that he was entitled to a copy of the videotape containing the forensic interview of S.L. under Rule 16(a)(1)(D) as a scientific test.[7]

In addition, we conclude that the trial court appropriately denied the defendant's motion to compel the State to provide the defendant a copy of the videotape pretrial under Rule 16(a)(2). The defendant cites no case law to support his contention that videotaping a witness's interview converts the witness's statement into a "tangible object" and, thus, makes the statement discoverable pretrial under Rule 16(a)(1)(C). Under Rule 26.2(g)(2), a statement of a witness may include an oral statement that is "recorded contemporaneously with the making of the oral statement and that is contained in a . . . mechanical . . . or other recording." Tenn. R. Crim. P. 26.2(g)(2). The simple fact that S.L.'s forensic interview was videotaped did not convert her statement into a "tangible" object that is discoverable pretrial. Furthermore, we note that the defendant had access to the forensic

---

[7]Because we find the defendant has waived this issue, we decline to address whether a forensic interview of a child rape victim constitutes a scientific test.

interview tape pretrial, as the State made the tape available for defense counsel to review as often as needed. For these reasons, we conclude that this issue is without merit.

## III. Prosecutorial Misconduct

The defendant argues that the trial court erred in "allowing the State to ask the [d]efendant numerous argumentative questions." That State responds that defense counsel only objected to two questions as being argumentative and, therefore, only these two questions are properly before this court, that both were proper for cross-examination, and even if the questions were objectionable, they constitute only harmless error.

We first address the State's contention that only two cross-examination questions are properly before this court. The defendant cites ten separate instances in the trial transcript where he argues the State's questions or comments on cross-examination were argumentative and improper. Defense counsel, however, failed to object during seven of these instances and "[w]ithout contemporaneous objection, the error, if any, is waived" for these seven questions and comments. State v. Pritchett, 621 S.W.2d 127, 135 (Tenn. 1981) (citing State v. Sutton, 562 S.W.2d 820 (Tenn. 1978)); see also Reece v. State, 555 S.W.2d 733, 735 (Tenn. Crim. App. 1977) (finding that if there is no defense objection to a State's cross-examination question, there is no error). In addition, of the three remaining questions that were objected to by defense counsel, only two were objected for being argumentative, the objection for the remaining question being that it called for speculation. As we previously noted, a defendant may not change theories on appeal but is bound by the evidentiary theory he set forth at trial. Thus, a question that was objected to at trial as being speculative cannot be challenged on appeal as being argumentative. As such, we agree with the State that only the two questions that the defendant objected to for being argumentative are properly before this court for review.

The right to cross-examine a witness is fundamental. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). The manner, scope, and control of cross-examination lies within the sound discretion of the trial judge. State v. Humphreys, 70 S.W.3d 752, 766–67 (Tenn. Crim. App. 2001). The trial judge's "exercise of such discretion will not be interfered with except in case of plain abuse of it." State v. Fowler, 373 S.W.2d 460, 466 (Tenn. 1963) (citing Davis v. Wicker, 333 S.W.2d 921 (Tenn. 1960)).

The first question the defendant claims was argumentative concerned the State asking him why, if J.L. was lying, she would not have made up a more elaborate story:

[THE STATE]: [I]f [S.L.] was going to ask [J.L.] to make something up about you, why not make up something more than just a simple touch of the breast, sir?

[DEFENSE COUNSEL]: Objection. Argumentative, calls for speculation.

THE COURT: All right. This is cross-examination. I'll overrule the objection.

-12-

Even accepting, *arguendo*, that this question was argumentative, we find it constitutes harmless error.

The second question the defendant claims was argumentative concerned S.L.'s forensic interview videotape that was played for the jury at the request of the defendant. To put in context this objection, we will set out a portion of the State's cross-examination of the defendant:

Q: What kinda [sic] man rapes somebody anyway, Mr. Song?

A: I don't imagine, sir.

Q: But, apparently, [S.L.] has a very active imagination, doesn't she?

A: What do you mean, "active imagination," sir?

Q: You watched that videotape this morning; right?

A: Yes, sir.

Q: You heard all the things that she told that interviewer; correct?

A: I saw that.

Q: You heard it; right?

A: I saw that.

Q: Yes.

A: And I heared (sic) a lot of things. The lady talk to [S.L.] is making and leading the -- the -- what she -- the -- you know -- the leading conversation.

Q: Yeah. Like, when –

A: That's what I feel.

Q: -- like, when she asked [S.L.] what it felt like when your penis was inside of her mouth and [S.L.] said that it –

[DEFENSE COUNSEL]: Judge –

Q: Made her choke.

-13-

[DEFENSE COUNSEL]:  -- I'd like to object.  I'd like Counsel –

THE COURT:  All right.  What's –

[DEFENSE COUNSEL]: -- to tone it down a little –

THE COURT:  -- your objection?

[DEFENSE COUNSEL]:  -- tone it down a little bit.

THE COURT:  Well, talk to me, don't talk to him.

[DEFENSE COUNSEL]:  Well, I –

THE COURT:  What's your objection?

[DEFENSE COUNSEL]:  I'm asking the Court to ask Counsel to lower –

THE COURT:  He's fine.

[DEFENSE COUNSEL]:  -- his voice.

THE COURT:  What's your objection?

[DEFENSE COUNSEL]:  Argumentative.

THE COURT:  All right.  [(To the State)] Do you care to be heard?

[THE STATE]:  No.

THE COURT:  All right.  Go ahead.

The original question by the State, "What kinda [sic] man rapes somebody anyway?" was not contemporaneously objected to by defense counsel, and we conclude the defendant waived any objection to it.  The question that was posed to the defendant contemporaneously with the argumentative objection simply asked the defendant if he heard what S.L. told the interviewer on the tape. Defense counsel originally objected to this question by asking the trial court to have the State "tone it down a little bit" and only decided later the question was argumentative.  As such, we again conclude the defendant waived this objection.  Accordingly, this issue is without merit.

## IV. Denial of Motion for New Trial

The defendant argues the trial court erred in not granting his motion for a new trial based on newly discovered evidence. This evidence consisted of a 1993 order of protection filed by the victims' mother against their biological father after he attempted to run them over with his car and threatened them with a knife. The defendant argues on appeal:

> With the smoking gun that the biological father had been abusive enough to threaten to kill his own children while chasing the mother with a knife, and had attempted to run her and the children over with a vehicle, coupled with the testimony of the mother that she had been suspicious of the biological father for sexually abusing the children, the new evidence would have led the jury to conclude that there was enough of a possibility that the biological father had in fact sexually abused [S.L.] and caused the injury.

The State argues this order of protection did not constitute newly discovered evidence and did not make it less likely that the defendant sexually abused the victims.

When a defendant seeks a new trial based on newly discovered evidence, he must show (1) reasonable diligence in seeking the newly discovered evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Whether or not to grant a new trial based on newly discovered evidence, however, lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 220 Tenn. 383, 417 S.W.2d 774, 778 (1967)). We review this issue, therefore, for an abuse of discretion.

In denying the defendant's motion for a new trial, the trial court found the order of protection did not qualify as newly discovered evidence because it was readily available prior to the trial and could have been found. In addition, the trial court noted that "even setting that aside, [it did not] think . . . you can jump between an order of protection involving threats, if, in fact, that occurred, and surmising that [the victims' biological father], therefore, sexually abused the victim[s] in this case." We agree with the both of these findings. The order of protection, filed in 1993 and available to the defendant if he had looked for it, did not constitute newly discovered evidence. In addition, the defendant has failed to explain why the fact an order of protection was obtained shows that the victims' biological father may have sexually abused them. We find the order of protection that accused the victims' biological father of making threats toward the victims was not of such materiality that it would have changed the outcome of the trial. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a new trial based on newly discovered evidence.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the defendant's convictions and sentence and affirm the trial court's denial of his motion for a new trial.

_____
ALAN E. GLENN, JUDGE