**STATE of Tennessee, Appellee,**

v.

**John Thomas GOSWICK, Jr., Defendant-Appellant.**

Supreme Court of Tennessee, at Jackson.

Aug. 29, 1983.

---

Edward G. Thompson, Memphis, for defendant-appellant.

William M. Leech, Jr., Atty. Gen., J. Andrew Hoyal, II, Asst. Atty. Gen., Nashville, Jerry Harris, Kathleen O. Spruill, Asst. Dist. Attys. Gen., Memphis, for appellee.

## OPINION

DROWOTA, Justice.

We granted the Defendant's application for permission to appeal because we are of the opinion that the trial court erred in failing to grant the Defendant's motion for a new trial based on newly discovered evidence. We find the Defendant showed reasonable diligence, that the newly discovered evidence is material, and that such evidence is likely to change the result if accepted by a jury.

The Defendant, John Thomas Goswick, Jr., was convicted of burglary in the first degree and aggravated rape and sentenced to not less than five nor more than ten years, and thirty years, respectively. The sentences are concurrent. This is the second trial of this case, for a mistrial was declared in the first trial when the jury was unable to reach a verdict.

At the time of the second trial on January 19, 1981, Karen Faye Adams was 21 years old, was divorced and had a four-year-old son who lived with her in her townhouse apartment in Memphis. Ms. Adams moved to Memphis from Pittsburg, Pennsylvania, after her divorce in January 1980. In April of 1980, she worked at a Quick Shop food store and sometimes did double shifts at another store in the chain.

The Defendant met Ms. Adams ten days prior to the incident for which he is charged. Ms. Adams testified that she first saw the Defendant on the night of April 16th and the morning hours of April 17th while she was working. He entered the store on April 16th around 9:30 p.m. and talked with her at that time. After she had completed her 3 to 11 p.m. shift, she went to work at a second store around 11:15 p.m. The Defendant appeared at this store shortly thereafter. He was still there when a friend of Ms. Adams, Keith Easterwood, arrived. She asked Easterwood to stay and the Defendant finally left. Ms. Adams testified that the Defendant returned in the early morning hours of April 17th and she had an unpleasant encounter with him and had called the police. She stated that the Defendant left shortly after 3 a.m., before the police arrived. The Defendant called the next afternoon and was told that she was busy but if he wanted to call her, to telephone her at home. He did not call her again and the last time he saw her was April 25th when he bought some cigarettes.

On Friday, April 25th, Ms. Adams worked the 3 to 11 p.m. shift and her son spent the night with her mother because she planned

to go to work the next morning at 7 a.m. After work, she returned to her apartment where Allen Staples was waiting for her. She had received threatening phone calls, and had had a gun stolen from her apartment several days before, and that day had given Staples a key to her apartment. The apartment consisted of a livingroom and kitchen downstairs and two bedrooms and a bath upstairs. Staples had checked the doors and windows and found them to be securely fastened. Around 1 a.m. Staples left and Ms. Adams locked the front door and put the chain on the door. Staples called her after 1:30 a.m. to check on her and she said that she was all right and was going to bed. She went to sleep around 1:50 or 2 a.m. She woke up around 2:30 and "there was a man standing over me with a knife." He told her to lie down on the floor on the left side of her bed where he had placed a tarpaulin. He raped her, forced her to perform oral sex, and then raped her again. Although she was naked, she said her attacker was fully dressed with bluejeans, a belt with a hash pipe on the buckle, and a T-shirt. After the sexual acts, the intruder picked up the tarpaulin and left her apartment through the front door. Ms. Adams testified that: "I went down and locked the door and I went upstairs and I took a shower. I went in my bedroom and locked the door and I don't remember anything else." The next thing she recalled was that a police officer was in her bedroom, she was lying on the floor and the officer was trying to wake her up. Her brother was also standing in the room.

Ms. Adams' brother, Ronald Martin, testified that he worked an 11 p.m. to 7 a.m. shift. He went by his sister's apartment at 9 a.m. on Saturday, April 26th, to tell her he had set up an appointment for her to talk to his store manager with reference to a job. He saw her car in front of her apartment and he knocked on the door and got no response. He then went to a nearby store and called her on the phone and got no answer. He returned to her apartment where he saw Staples outside the apartment. They banged on the front and back door again but still could not arouse her.

When they returned to the front, two police officers drove up at approximately 11:20 a.m. The officers also knocked on the door and, receiving no answer, got a passkey from the resident manager and opened the front door but it was chain locked, so they kicked the door in. One officer went upstairs and, finding the bedroom door locked, kicked it open. Ms. Adams was found lying on the floor unconscious.

Martin testified that he found his sister lying on the floor and she was hysterical. About 10 to 15 minutes later, she calmed down and told him she had been raped.

Allen Staples testified that he met Ms. Adams at a Quick Shop around the first part of 1980 and that in April they were dating frequently and he had spent the night with her before. He stated that before he left Ms. Adams around 1 a.m. Saturday morning, he made sure that she had locked the door behind him. He had planned to go shopping with her that morning. He had slept late and called her around 11 a.m. Not receiving an answer, he went to her apartment and saw her car out front. He could not rouse her by knocking and he checked around the apartment and found no evidence of any entry into the apartment. After the police had entered the apartment, he testified that Martin had told him that his sister looked like she had been drugged, and she was spaced out. Martin denied saying this. Staples saw Ms. Adams Sunday and she appeared to be down. He stated: "She told me that she had done some acid."

A nurse at the Rape Crisis Center examined Ms. Adams about 1:15 p.m. on Saturday and found some redness and tenderness in the genital area. Tests were inconclusive regarding the presence of sperm. Ms. Adams was having her menstrual period at this time.

Ms. Adams testified that she had seen her assailant before when he had come into the store where she had been working. On April 29, 1980, she identified the Defendant as her attacker in a lineup held at the police station. Keith Easterwood, who met Ms.

Adams in April and was currently dating her, identified the Defendant in a lineup on the same date. He identified the Defendant in court as the man present at the time he was in the Quick Shop on April 17th.

Goswick testified that he worked for an automotive wholesale paint business and was a part-time musician who often played in the Overton Square area near the Quick Shop. As a customer, he met Ms. Adams there and she gave him her name and phone number on the back of a cash register receipt dated April 17, 1980. He stated that he was in the store when Keith Easterwood came in but denied coming back later and harassing Ms. Adams.

The Defendant stated that he did not have any tarpaulins of his own or in connection with his employment. On April 26, at approximately 7:15 p.m., he went with Alan Collier to the movies at the Memphis Public Library. About 9 p.m., they went to a bar for an hour and a half; they then went to Solomon Alfred's in Overton Square where they saw Susan Parham, Stephen Smith and David Rieben. He stayed there until 2:30 a.m. From there he went to Collier's house and watched a television movie until 3:30 or 4 a.m. He went home at 4 a.m. and went to bed. He denied being around Ms. Adams' apartment complex that evening and stated that he knew nothing of the crime.

Alan Collier, Susan Parham, Stephen Smith and David Rieben each corroborated Defendant's alibi.

Based on the above described testimony, the jury found that the Defendant had committed the alleged crime. At the motion for a new trial, the defense submitted the affidavit of Steve Lomax who had earlier been described by Ms. Adams as "a friend of mine." Counsel for Defendant also submitted an affidavit to show that due diligence had been used in investigating the case. After trial, defendant counsel learned for the first time from one of the two police officers who was at the apartment on April 26th, that two telephone calls were received at Ms. Adams' apartment while they were there conducting their investigation. An assistant district attorney general supplied the name of Lomax as one of the callers. Counsel had interviewed Lomax before trial and he had claimed no knowledge of the incident. Counsel again interviewed Lomax after learning of his telephone call to Ms. Adams' apartment on April 26th.

In his affidavit Lomax states:

"In September, 1980, I talked with Mr. Thompson, attorney for John Goswick, about the charges against Mr. Goswick. At that time, I told him I did not know anything I thought was relevant to the rape, that I was not with Karen Adams in the early morning hours of April 26, 1980, or anytime that day and that I did not know why she asked me to go to the preliminary hearing, other than just to be a friend.

On March 16, 1981, Mr. Thompson contacted me at my place of employment and told me one of the officers who was at the scene on April 26, 1980, had reported that I had called her apartment that day. I had called Karen Adams at home about 8:30 a.m. on Saturday, April 26, 1980. She answered the phone, I identified myself, she said she could not talk right then and asked me if I would call back later. She did not sound like she was in any distress, and I assumed that she had just woke up and had things to do and couldn't talk at that time. I called back some time after 11:00 a.m. and was told by her brother that she had apparently been raped. . . . I did not reveal all of this information in September because I didn't think it was important or relevant to the case."

 The decision to grant or deny a new trial on the basis of newly discovered evidence is a matter which rests in the sound discretion of the trial court. *Jones v. State,* 519 S.W.2d 398 (Tenn.Cr.App.1974). However, in *Taylor v. State,* 180 Tenn. 62, 171 S.W.2d 403 (1943), Justice Chambliss, speaking for the Court, states:

"In passing on a motion for a new trial for newly discovered evidence when (1) reasonable diligence has been shown, and

(2) its materiality is evident and, therefore, likely, as here, to change the result, if produced and accepted by the jury, the granting of a new trial is a matter of right. This appearing without a conflict in the testimony heard by the trial judge, the rule vesting controlling discretion in the trial judge does not govern on appeal [citations omitted]. 171 S.W.2d at 405. In *Taylor,* as in this case, no oral testimony was presented. The trial court had only affidavits which were not in conflict and therefore the rule vesting controlling discretion in the trial judge does not govern on appeal.

■ There is no question that reasonable diligence was shown by Defendant's counsel. We must thus determine whether Lomax's testimony is material and likely to change the result, if produced and accepted by the jury.

The trial judge felt that the testimony of Lomax would merely be impeaching evidence, and that other impeaching evidence had been introduced, and that this testimony would not change the opinion of the jury. The Court of Criminal Appeals agreed holding "[w]e are satisfied that a different result would not be reached."

The State argues that the newly discovered evidence, though relevant, is not so material that a different result would follow. We are of the opinion that the issues to which the newly discovered evidence relates are material and that such evidence is likely to change the result if accepted by the jury. "The question is not what the jury might do, but, supposing all the evidence new and old to be before another jury, whether they ought to return a verdict more favorable to the defendant than the one returned on the original trial." *Evans v. State,* 557 S.W.2d 927, 938 (Tenn.Cr.App.1977).

We find the evidence of Lomax goes beyond mere impeaching testimony. Ms. Adams testified that after the rape, she took a shower, went to her bedroom and locked the door and didn't remember anything else until the police officer tried to wake her up around 11:30 a.m. The rape occurred around 2:30 a.m. She had, therefore, been

unconscious for approximately eight hours. Yet Lomax states that he called Ms. Adams about 8:30 a.m. and she answered the phone and did not sound like she was distressed and she asked if he would call back later.

The significance of Lomax's testimony, which the jury did not have the benefit of, is: (1) Officer O'Byrne testified that the upstairs phone in the bedroom was out of order, therefore, if Lomax is to be believed, Ms. Adams would have had to be downstairs in her apartment at 8:30 a.m. because the second phone is in the kitchen; (2) Ms. Adams' account of the events that transpired on April 26th are not only suspect, but unbelievable, for she could not be unconscious for eight hours and also talk to Lomax on a downstairs phone at 8:30 a.m.; (3) Lomax states Ms. Adams "did not sound like she was in any distress" at 8:30 a.m., yet at 11:30 a.m., she was hysterical. Perhaps the most significant aspect of Lomax's testimony is the failure of Ms. Adams to complain when called.

The Defendant asserts that if Ms. Adams was raped between 2:30 and 3:30 a.m., she had every opportunity to tell Lomax and would have advised him at 8:30 a.m. that she had been raped if in fact she had been. The Defendant contends that the affidavit of Lomax goes to the central incident of which the conviction stands—was she, in fact, raped? If she was, why did she not advise her good friend at 8:30 a.m.?

Ms. Adams was never questioned about the 8:30 a.m. phone call from Lomax because counsel was unaware of the existence of such a call. If a jury believed Lomax, then at 8:30 a.m. Ms. Adams was necessarily downstairs in her kitchen, she was conscious—not hysterical, and she failed to mention the rape to her friend, which occurred a few hours earlier. Defendant asserts that such evidence is more than impeaching evidence and more than cumulative evidence, and we agree.

Having found (1) that the Defendant showed reasonable diligence, (2) that the newly discovered evidence is material, and (3) such evidence is likely to change the

result if accepted by the jury—we conclude that the trial court erred in failing to grant a new trial. This cause is accordingly remanded to the Criminal Court of Shelby County for further proceedings consistent with this opinion.

FONES, C.J., and COOPER, BROCK and HARBISON, JJ., concur.