IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 29, 2025 Session

## STATE OF TENNESSEE v. JAMES ELVIS PRESLEY

**Appeal from the Criminal Court for Monroe County**
**No. 2021-CR-177   Andrew M. Freiberg, Judge**

_____

### No. E2025-00166-CCA-R9-CD
_____

In this interlocutory appeal, the State asks this court to review the trial court's order granting Defendant's motion for new trial. After reviewing the entire record, the briefs and oral arguments of the parties, and the applicable law, we reverse the trial court's order.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Reversed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Stephen Hatchett, District Attorney General; and Sean Boers and Ashley M. Ervin, Assistant District Attorneys General, for the appellant, State of Tennessee.

William W. Gill, Assistant Public Defender, Tennessee District Public Defenders Conference, Appellate Division, Franklin, Tennessee (on appeal); Donald Leon Shahan, Jr., District Public Defender; and Paul D. Rush and Tammy Crayne, Assistant District Public Defenders, (at trial), for the appellant, James Elvis Presley.

## OPINION

### Facts and Procedural History

In June 2021, the Monroe County Grand Jury indicted Defendant, James Elvis Presley, for the second degree murder of his wife, Angela Presley ("Victim").

*Trial*

On January 4, 2021, law enforcement responded to a call at the home of Defendant and victim where they found the victim deceased on the couch covered with blood. A recording of the 911 call made by the victim's father, Jackie Bell, was played for the jury. Mr. Bell reported that Defendant told him the victim was drunk, hit her head, and was not breathing. Because the victim had broken their cellphone, Defendant came to Mr. Bell's home and asked him to make the 911 call. In response to questions from the 911 dispatch relayed to Defendant by Mr. Bell, Defendant denied that he and the victim had been fighting, denied that she broke the phone while fighting, and said the victim hit her head on a desk or rolling chair and had not been breathing for approximately thirty minutes.

Corporal Clint Brookshire with the Monroe County Sheriff's Office ("MCSO") responded to the scene. He described the home as a "tiny house" converted from a "small wooden barn, shed, and turned into a house" with no electricity or running water. Upon entry to the home, Corporal Brookshire first noticed blood on the left side of the couch "down to the bottom right of the couch" and a female subject lying on the couch. The victim's body was "cold to the touch" and "a little rigid, hard to move." The room in which the victim's body was found was in disarray, and there were holes in the walls consistent with gunfire. There was a shotgun in the home as well as "numerous" spent shotgun shell casings both inside and outside. Defendant arrived just prior to Corporal Brookshire's arrival. Body camera footage of law enforcement's interaction with Defendant was shown to the jury. Defendant said he and the victim had both been drinking alcohol and that the victim fell and hit her head on a rolling office chair. The victim had stopped breathing when he went to her father's home to call 911. Corporal Brookshire described the chair as a plastic base with cloth fabric and plastic casters. He saw no injuries to Defendant.

Ashley Rodgers, a paramedic who arrived on the scene, testified that the victim had "lots of blood" on her head, a small puncture wound near the left side of her forehead and swollen and blackened eyes. Rigor mortis had already set in, indicating that the victim had been dead at least two hours. Ms. Rogers presumed that the victim had been shot based on what appeared to be a bullet wound in the victim's forehead and several empty bullet casings in the home.

Defendant was detained and read his *Miranda* rights.[1] Law enforcement collected Defendant's clothing. MCSO Detective Samantha Filley observed that Defendant had dried blood on his hands and clothing, but no visible injuries other than minor scratches on his hands. Defendant explained that he had tried to move his wife and tried to remove

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding any statement made by the accused during a custodial interrogation without the benefit of procedural safeguards is inadmissible in court).

some of the blood from her body. Law enforcement also photographed the scene including a shotgun with a cracked stock. Testing of the gun revealed no blood or hair. Law enforcement did not collect or test blood on the pillow where the victim's body was located nor did they test any of the areas in the home that appeared to show blood spattering.

Detective Doug Mills photographed the scene and collected and processed evidence. He was also present with former Detective Dan Schneider when Defendant was later interviewed. The recorded audio-visual interview was played for the jury. After waiving his *Miranda* rights, Defendant said that on the night the victim died, they had both been heavily drinking "for a while" and drank four pints of vodka. Defendant said the victim left to go to Tellico to buy more alcohol; he thought someone picked her up but did not know who it was. Before the victim left, she shot at him with the shotgun which he took from her and threw against the wall, breaking the stock. He said he also took two shells from the victim and put them in his shirt pocket.

Defendant said when the victim came home with two pints of vodka, she had blood "gushing" down the side of her head; he did not notice any other injuries but said it was dark and he was drunk. He wanted to get medical help for the victim, but she got angry and hit him and refused to get medical help. Defendant said the victim fell, hitting her head on either a desk or a rolling chair. They argued about him calling for medical help; she refused help and hit him in the head with the phone, breaking it. The victim wrapped her head wounds and lay down on the couch. Defendant said he also lay down on the couch with his head at the opposite end of hers. When he woke up, he noticed she was not breathing. Because the phone was broken, he drove to Mr. Bell's house to have him call 911 after which Defendant returned home to meet law enforcement.

Defendant said he had blood on his hands because he had tried to help the victim clean the blood from her body. He denied hitting her again after they lay on the couch. Defendant denied knowing how the victim got the numerous bruises and cuts; he insisted he saw only the blood streaming down her face. He admitted to "smacking" her two or three times earlier in the day with an open hand on the left side of her face. He also denied pushing her to cause her fall, insisting she tripped on pillows while trying to go to the bathroom. He claimed the victim kicked and hit him in his hand, groin, and nose while he tried to get her medical help. Defendant claimed, "No way I beat her to death."

Defendant consented to law enforcement returning to the home to search for and retrieve the phone. They collected the phone but did not retrieve any phone records.

Special Agent Kenna Icet, a forensic scientist with the Tennessee Bureau of Investigation, conducted DNA testing on the blood stains on Defendant's shirt and confirmed the presence of the victim's blood on the right sleeve, front left pocket, and the

back of the shirt. She also found the victim's DNA in blood stains on Defendant's pants and hat. She confirmed that she did not test the pillow on which the victim's head lay on the couch.

Dr. William R. Oliver performed the victim's autopsy. At the time of trial, Dr. Oliver had retired from the Knoxville Regional Forensic Center. Because Dr. Oliver had been subpoenaed but was unavailable due to his obligation to testify in an out-of-state proceeding, the State moved to allow Dr. Darinka Mileusnic-Polchan to testify at trial regarding the autopsy report and findings. Defendant did not object and the trial court granted the motion. Dr. Mileusnic-Polchan testified that she had supervised Dr. Oliver before his retirement. She had reviewed photographs of the scene, the autopsy report, x-rays, tissue slides and samples, and the forensic autopsy investigator's case file. Dr. Mileusnic-Polchan concurred with Dr. Oliver's findings that the cause of the victim's death was homicide. Testing revealed that the victim's blood alcohol content was .023 percent.

Dr. Mileusnic-Polchan explained that the victim's injuries included multiple areas of impact, abrasions, scrapes, and lacerations. The victim had "purple red bruising" which was not normally seen in a simple fall. The victim also had injuries on her left hand with bruising the same color as those on her face, indicating those injuries were defensive injuries incurred at the same time as the other injuries. She said the "widespread area of involvement" of the injuries, including those to the ears and eyelids, and direct blunt force trauma to the eyeball, was also inconsistent with a fall. The substantial injuries on the left side of the victim's face were consistent with her left arm and hand injuries, indicating the victim was likely trying to cover her face. Dr. Mileusnic-Polchan explained that the large volume of blood on the couch and matted in the victim's hair would have been from the lacerations to the forehead, ears, and lips because all of those areas bleed extensively. The impacts on the victim were so forceful that they tore the skin and the subcutaneous tissue, and the tissue under the skin, all the way to the cartilage.

When asked what the blood patterns would have looked like if the victim were walking around with those injuries, Dr. Mileusnic-Polchan said that the victim would have dropped blood where she walked and that her body would have been covered in blood. However, because the victim had blood stains primarily on her chest and thighs, she was most likely in a seated position when the injuries were sustained. Dr. Mileusnic-Polchan explained that the multiple impacts received by the victim resulted in bleeding on top of the brain, which, if left unchecked, would have been disabling and would eventually cause death. When asked to opine whether the injuries were immediately fatal, Dr. Mileusnic-Polchan explained that it would depend on the extent of the trauma and how fast the blood accumulated on top of the brain. She thought it would not likely be immediate or instantaneous but would cause disability or unresponsiveness or loss of consciousness and progressively lead to death as the brain swelled. The victim's blood had already clotted,

meaning that "a couple of hours" had passed between the time the injuries occurred and when she died. Dr. Mileusnic-Polchan also opined that the victim would not have been able to walk or drive with the trauma she sustained to the brain and the size of the subdural hematoma.

On cross-examination, Dr. Mileusnic-Polchan confirmed her agreement with Dr. Oliver's autopsy report that the victim's death was a homicide caused by multiple blunt force injuries to the head. She reiterated that the report indicated the autopsy findings were not consistent with Defendant's statement that he knocked the victim down and she hit her head resulting in her death. Dr. Mileusnic-Polchan believed the victim was hit with an object because of the multiplicity and distribution of the trauma to the victim and the fact that Defendant did not have a broken hand. She identified an "L-shaped" pattern of trauma on the victim's forehead. However, she was not able to identify, nor was she presented with an object that could have caused the injuries. Dr. Mileusnic-Polchan agreed that some of the bruises on the victim's body could have been caused from a car wreck days before her death but not the brain bruising and subdural hematoma.

When the State rested its case, Defendant indicated that he had served Dr. William R. Oliver with a subpoena to testify and had intended to call him as a witness. However, because Dr. Oliver was not present, Dr. Karen Whittaker testified as an expert in emergency and internal medicine. Dr. Whittaker was working in the emergency room at Sweetwater Hospital when the victim's body arrived. Because the victim was deceased, her body went directly to forensics for examination. Dr. Whittaker had experience with subdural hemorrhage brain bleeds and testified that it is possible for someone with the type of subarachnoid hemorrhage the victim was shown to have had on the autopsy report to be awake and conscious. She added that if the hemorrhage is small, a person could walk but would likely show symptoms and have difficulty moving. Dr. Whittaker admitted on cross-examination that she did not see the victim's body nor did she go to the scene of the crime. The size of sustained brain trauma would be a significant factor in a person's consciousness. After looking at an autopsy photograph of the victim's brain trauma, she agreed that the victim had significant trauma to the face but said it was possible that the victim could have been walking after the injuries.

Former Detective Schneider testified as a witness for Defendant. He was a detective with the MCSO and the chief officer on this case at the time of the victim's death but had since been terminated. He reviewed the affidavit of complaint he prepared in this case and agreed that contrary to the facts stated in the affidavit, Defendant did not tell him that he pushed the victim to the floor, nor did the provisional autopsy report show evidence of strangulation. He did not collect the pillow on which the victim's body was found, nor did he collect any blood outside the home. He agreed that the broken cell phone, empty vodka bottles, rolling chair and desk with a "chunk" missing from the edge observed at the scene

corroborated Defendant's story. He did not investigate whether the victim went to Tellico as claimed by Defendant. Former Detective Schneider agreed that he was terminated in 2006 by the Harriman Police Department for violating rules while engaging in a high-speed chase and subsequent cover-up. He had also been suspended in 1995 while working in Broward County, Florida for reporting a fictitious illness.

At the time of trial, Lisa Taylor was the medical-legal death investigator for the Knox County Regional Forensic Center. She indicated that as a part of her work, she had investigated the victim's death and had created a case file which she did not bring to court. The case file would include the autopsy report, available medical records, a log of conversations with everyone with whom she communicated during the investigation, and photographs of the crime scene and autopsy. She took a verbal report of the victim's death over the phone from an emergency department nurse at Sweetwater Hospital.

At the close of Defendant's proof, Defendant moved to dismiss the indictment because he had not received the forensic investigator's report in discovery. Tenn. R. Crim. P. 16(a) (setting forth required disclosure by the State). All parties agreed they were unaware that the medical examiner's office had forensic investigators. The State responded that it had not seen the report and had not used it in its case-in-chief. The trial court denied the motion finding that the forensic investigator's file was not in the State's custody and control and that the motion should have been made prior to trial. Defendant responded that he could not have made the motion prior to trial because he was unaware of the existence of the report until Dr. Mileusnic-Polchan testified. Defendant next moved to strike Dr. Mileusnic-Polchan's testimony; the trial court also overruled that motion.

Based on these facts, the jury convicted Defendant as charged. Following a hearing, the trial court sentenced Defendant to twenty-three years in confinement.

*Motion for New Trial*

Defendant then filed a timely motion for new trial which he later twice amended, arguing among other things, that the State violated Rule 16 by withholding the forensic autopsy investigatory case file and that the trial court erred when it refused to strike Dr. Mileusnic-Polchan's testimony after learning that she reviewed the investigatory case file in forming her opinion. For these alleged violations, Defendant requested that he be granted a judgment of acquittal, or in the alternative, a new trial. At a February 26, 2024 hearing, Defendant indicated that after learning at trial that the medical examiner's office had an investigator, he had requested and received a link to the investigator's case file. He had accessed the link and had reviewed the material; however, at the hearing the link was not working. While the link had been working, defense counsel found an October 7, 2021 letter from Dr. Oliver to former Detective Schneider with follow-up information on the

autopsy and the victim's injuries indicating that no particular object or tool was suggested by the injuries. The hearing was continued to allow the parties to access the investigative file and Dr. Oliver's letter. Prior to the next hearing, Defendant again amended his motion for new trial, arguing that the State committed a *Brady*[2] violation when it failed to disclose Dr. Oliver's letter to former Detective Schneider and that the remedy was a judgment of acquittal, or alternatively, a new trial.

At the continuation of the motion for new trial hearing on April 19, 2024, the trial court encouraged the parties to be prepared to argue whether the trial court had discretion to grant a new trial under the following standard:

> I encourage both parties to prepare to argue whether the trial court has the ability to grant a new trial simply in the interest of justice if the confidence and reliability of the proceedings has been shaken. That an error, have been shaken. My experience with past motions for a new trial, as both a litigator and presiding judge, has dealt almost exclusively with arguments involving the greater weight of the evidence resting against conviction. The Vanderbilt rape case[3] outlined from mere memory above is the only precedent of which I am presently aware.

Prior to the hearing, the parties stipulated that former Detective Schneider had two copies of the letter from Dr. Oliver in his case file; that the State had requested former Detective Schneider's case file; that Dr. Oliver's letter had not been provided to Defendant; that Defendant had made the appropriate request for *Brady* material; and that following trial, Defendant subpoenaed former Detective Schneider's case file and discovered the letter.

At the hearing, Dr. Oliver testified and identified the letter he had written to former Detective Schneider. In the letter, he opined that because he saw no repeated pattern of the wounds to the victim when conducting the autopsy, he did not believe a specific object or instrument had been used. He noted blunt trauma to the left side of the victim's face which was more consistent with a fist or a soft object. He described the victim's brain injuries as

---

[2] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (establishing the constitutional principle that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

[3] The trial court does not specify which Vanderbilt rape case it references. Our research indicates that at least five appellate decisions to date align with the case timeline. In any event, identification of the case is not relevant to the issue before us.

a subdural hemorrhage and contusion of brain substance and opined that such injuries could have been caused from a fall or from a blow. Dr. Oliver referred to the victim's autopsy report in confirming that there were approximately fifty milliliters of subdural fluid in the cranial space in the back of the victim's head and a focal contusion on the front of the head consistent with what is known as "a coup and contrecoup injury" in that there was an injury on opposite sides of the victim's brain. He explained that after the initial impact, the brain rebounds much like a tennis ball and collides with the skull on the opposite side causing additional damage. He testified that statistically, "a coup and contrecoup" brain injury is consistent with a fall, "but it doesn't have to be."

Dr. Oliver testified that he could not determine how long after someone sustained these types of injuries that the person would be rendered incapacitated; it could be immediate or delayed because the more accumulation of blood on the brain and swelling, the sooner one would become unconscious. He explained that because alcohol works like a blood thinner, a person under the influence of alcohol would bleed faster and longer. He also explained that one way a brain bleed induces unconsciousness is from the accumulation of blood. When asked if the victim could have been ambulatory, Dr. Oliver replied, "I have no idea." He noted that the victim's ability to walk could not be determined from the anatomical evidence, nor could he establish the order of the injuries. He felt "comfortable" saying that the victim died of a brain bleed that occurred less than ten hours before the point of death.

Dr. Oliver opined that if a person had inflicted the types of injuries the victim sustained, he would expect to see contusions and fractures to the hand. Specifically, he would expect fractures less than ten percent of the time and contusions more than half of the time.

In his letter to former Detective Schneider, Dr. Oliver said the victim had both swelling and contusion of the brain, which were more consistent with someone who had received multiple blows to the head. He noted that there was an "L-shaped" injury on the victim's forehead.

Prior to the hearing, Assistant District Attorney ("ADA") Sean Boers had communicated with Dr. Oliver about his letter to former Detective Schneider. Dr. Oliver agreed that he told ADA Boers that he did not see a lot of discrepancy between what he would have said at trial and Dr. Mileusnic-Polchan's trial testimony. He agreed that the victim had been "pummeled"; he also agreed that she could have fallen in a fight. Because he saw no repeated pattern, he did not believe the victim was hit repeatedly with a particular object or instrument. He confirmed that in his letter to former Detective Schneider he did not say that an object was not used. He received some photographs of the crime scene but did not recall referring to them in making his findings. He agreed that viewing the victim's

body at the crime scene would have helped him in making his findings. He did not refer to the crime scene photographs in his letter. He testified that the opinions he gave in his letter were based solely on the victim's anatomic injuries which he observed when he performed the autopsy.

The trial court also questioned Dr. Oliver to "clarify [his] testimony" noting that Dr. Oliver had indicated the injuries were consistent with a fall but could also be from a blow. Dr. Oliver explained that certain injuries were inconsistent with a fall and specifically referred to the blunt force trauma to the victim's eyes:

> This person has a boat load of injuries on her. Some of them are rather strongly suggestive of a fall, or stumbling, anyway. And those are the injuries, for instance, to her knees. You tend to get those injuries to the knees when you fall to your knees. And some of the injuries are not consistent with, are strongly not consistent with a fall, or not suggestive of a fall. And those include, for instance, the injury to her ear, and the injury to the convex surfaces of the face, such as the eyes. You'd have to figure out a way for her to fall onto something that would poke into her eyes the way that, and it just doesn't look like that.

> So, when I'm talking about the subdural hemorrhage, okay, the subdural hemorrhage has the, has an appearance that you frequently see, that is classically seen, in falls. You have a coup injury to the front of the brain, you have a subdural towards the back of the brain. That's what you tend to get with falls. However, you can also get them in things like boxing matches and things like that without a fall. So it tends to be more with falls, but it doesn't have to be with a fall. That doesn't address the myriad of other injuries that she has.

Dr. Oliver also clarified that if a person is hit multiple times with the same object, one would expect to see multiple injuries matching the shape or pattern of the object. Here, he did not observe "multiple patterned injuries" from an object. He also clarified that all of the injuries appeared recent at the time of the autopsy, "within the same few hours."

The trial court took the matter under advisement and on September 20, 2024, entered a written order granting Defendant's motion for new trial on the basis of newly discovered evidence and vacated Defendant's conviction and sentence. In its order, the trial court noted that the week before trial, Defendant made an oral motion to continue the trial to secure the testimony of Dr. Oliver. Based on the State's representations that Dr. Oliver had retired and that Dr. Mileusnic-Polchan would testify in his stead regarding the autopsy results, the court denied the motion because "the cause and manner of death did not appear

- 9 -

to be in germane dispute, that an expert by nature often opines upon the facts and works of others, and that a trial continuance was not justified simply because defense counsel tarried to locate Dr. Oliver or preserve his testimony[.]"

The trial court summarized Dr. Mileusnic-Polchan's trial testimony in detail and found that Dr. Oliver's letter was not exculpatory but rather inculpatory of Defendant's guilt and "consistent with the opinions expressed before the jury by the substitute pathologist Dr. Mileusnic[-Polchan]." Both doctors testified that the trauma to the victim could have been caused by fists. The court specifically found that as Defendant could not establish Dr. Oliver's letter to be exculpatory or material, "Defendant cannot establish a violation of *Brady* and is not entitled to any relief regarding Dr. Oliver's letter about the case."

However, the court found that "Dr. Oliver's oral testimony about this case did cast matters about the circumstances surrounding the death of [the victim] in a new light." After summarizing Dr. Oliver's testimony, the trial court found such testimony to be credible and presented "significant factual differences on matters in germane dispute" between the two pathologists' testimonies. Dr. Mileusnic-Polchan testified that the victim was rendered immediately unconscious or incapacitated upon receipt of the injuries, leaving "no reasonable alternative to the conclusion that Defendant was criminally liable for homicide." Defendant's statement that the victim left the home and returned with injuries inflicted by someone else was not corroborated by the proof at trial; however, Dr. Oliver opined that the victim's injuries "are in some way consistent with a fall and that, most crucially, there was no anatomic or medical evidence to conclude [the victim] was rendered immediately unconscious or incapacitated as a result of sustaining her injuries." Dr. Oliver's testimony would have been the only tangible proof to corroborate Defendant's theory at trial.

In its order the trial court exercised its duty as thirteenth juror and "approve[d] of and affirm[ed] the decision of the jury in the matter," and denied relief pursuant to Rule 33(d) of the Tennessee Rules of Criminal Procedure.

However, the court then considered whether a new trial should be granted in the interest of justice on the basis of newly discovered evidence. The issue of newly discovered evidence arose from Dr. Oliver's letter, but the trial court's order granting the motion characterized Dr. Oliver's testimony from the hearing as the newly discovered evidence. The trial court analyzed Dr. Oliver's testimony under *State v. Caldwell*, 977 S.W.2d 110, 116-17 (Tenn. Crim. App. 1997), finding that to be entitled to relief, Defendant must establish: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." The court further referenced *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993),

noting that a trial court may only grant a new trial based on impeachment evidence if the evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal. The court then stated that Dr. Mileusnic-Polchan's testimony "completely contradicted" Defendant's "wholly unverified version of events," and without Dr. Oliver's testimony which supported Defendant's theory, Defendant had "little to no ability to make any credible arguments to the jury about alternative explanations for the death of [the victim]." The trial court found:

> While this court cannot say this new evidence is "likely" to produce an acquittal or different outcome at a new trial, it certainly "may" alter the new trial to use the legal terminology included in binding case precedent. The Court finds that the new evidence also shakes the confidence and reliability of the existing trial conviction by jury.

The trial court ultimately concluded:

> [B]ased upon the legal and factual grounds cited herein, the materiality of new evidence as supplied by the accredited testimony of Dr. William Oliver who conducted the autopsy of [the] deceased in this case, justice demands Defendant be afforded a new trial by jury. This Court has carefully considered the pleadings filed in this case, the arguments of counsel, the evidence introduced at trial and the motion hearing in addition to all matters of record, and finds the Defendant's Motion for a New Trial to be meritorious.

The State moved for permission to file an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The trial court granted the State's motion, and this court subsequently granted the State's application for permission to appeal pursuant to Rule 9, and requested the parties to address the following three issues in briefing:

1. Whether the trial court had the authority to *sua sponte* grant a new trial pursuant to Tennessee Rule of Criminal Procedure 33(a);

2. If so, what is the applicable standard to be employed; and

3. Whether the trial court abused its discretion by granting the motion for new trial?

**Analysis**

In this interlocutory appeal from the trial court's decision to grant Defendant a new trial, the State contends that Rule 33(a) of the Tennessee Rules of Criminal Procedure ("Rule 33(a)") provides a trial court with discretion to grant a defendant a new trial *sua sponte* "as required by law;" and in considering a motion for new trial based on newly discovered evidence, the standard must be whether (1) the defendant has been reasonably diligent in obtaining the evidence; (2) the materiality of the new evidence is apparent; and (3) the evidence is likely to change the result of the trial. The State argues that in this case the trial court abused its discretion by applying the standard for newly discovered evidence in a coram nobis proceeding. Defendant agrees that the trial court had the authority to *sua sponte* grant the motion for new trial and further agrees with the State on the applicable standard. However, Defendant argues that the trial court did not abuse its discretion by applying the standard for newly discovered evidence in a coram nobis proceeding and in granting him a new trial under Rule 33(a).

I. Trial Court's Authority to Grant a New Trial Sua Sponte under Rule 33(a).

Both parties agree, as do we, that Rule 33(a) confers upon the trial court discretion to order a new trial *sua sponte.* The construction of procedural rules are questions of law that are reviewed de novo with no presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011) (citing *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009)). The principles of statutory construction apply equally to the interpretation of procedural rules. *Dotson v. State*, 673 S.W.3d 204, 210 (Tenn. 2023) (affirming that Supreme Court Rules are interpreted using the same rules of construction in interpreting statutes); *see Thomas v. Oldfield*, 279 S.W.3d 259, 261 (Tenn. 2009) (reiterating that although "the rules of civil procedure are not statutes, the same rules of statutory construction apply[.]").

Our primary objective in reviewing court rules is "to effectuate the intent of the rule without broadening or restricting its intended scope." *State v. Rowland*, 520 S.W.3d 542, 544-45 (Tenn. 2017). When the text of a procedural rule is "clear and unambiguous," courts "need not look beyond the plain language of the text to ascertain its meaning." *Id.* at 545. Courts presume "that every word was used deliberately, that each word has a specific meaning and purpose, and that the intent was not to enact a useless or absurd procedural rule." *State v. Brown*, 479 S.W.3d 200, 205 (Tenn. 2015).

Rule 33(a) states:

*On its own initiative or* on motion of a defendant, the court may grant a new trial as required by law. If trial was by the court without a jury, the court on

motion of a defendant for new trial may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment.

Tenn. R. Crim. P. 33(a) (emphasis added). The language "on its own initiative or on motion of a defendant" indicates that the trial court may grant a new trial without involvement from the defendant. Indeed, the phrase "*sua sponte*," – Latin for "of one's own accord" or "voluntarily" – is defined as, "Without prompting or suggestion; on its own motion." Black's Law Dictionary, 12th ed. 2024. For these reasons, we conclude that, "on its own initiative" necessarily includes any issue the trial court in its discretion determines warrants a new trial "as required by law."

While trial courts may act *sua sponte* under Rule 33(a), they nevertheless remain bound by procedural and substantive constraints as indicated by the concluding language, "as required by law." While neither Tennessee statutes nor Tennessee caselaw provides a single comprehensive definition of "as required by law," its meaning can be understood through its application in Tennessee law. Under Rule 33, compliance with procedural requirements is a prerequisite to the trial court's authority to grant relief. Specifically, a trial court lacks jurisdiction to hear an untimely motion for new trial. *See* Tenn. R. Crim. P. 33(b) ("A motion for a new trial *shall be* in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered.") (emphasis added). This provision is mandatory and cannot be extended. Tenn. R. Crim. P. 45(b)(3); *see State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (reiterating that a trial court lacks jurisdiction over an untimely filed motion for new trial and that considering it does not validate the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989) (stating that an untimely motion for new trial "is a nullity" and leaves the trial court "no alternative but to dismiss the motion"). Thus, a trial court's ruling on an untimely filed motion for new trial would not comply with the language "as required by law."

Further, because "newly discovered evidence is a recognized ground for relief under Rule 33(a), a trial court has discretion to, "on its own initiative," grant a new trial "as required by law." We conclude that Rule 33(a) clearly provides that a trial court may s*ua sponte* grant a motion for new trial and may thus grant a new trial on an issue not advanced by the defendant in a motion for new trial, provided that the trial court is limited to remedies available as required by law.

II. Legal Standard for Granting a New Trial under Rule 33(a).

Having determined that the trial court may *sua sponte* grant a new trial under Rule 33(a), in the second issue, we consider the proper legal standard. Here, the trial court granted a new trial on a ground not raised by the Defendant – newly discovered evidence, specifically the testimony of Dr. Oliver, the original medical examiner, discovered by way

of Dr. Oliver's letter to former Detective Schneider.  In the trial court's order granting Defendant a new trial, it referenced the standard for granting a new trial based on newly discovered evidence in a motion for new trial, but it also referenced the standard for granting a new trial in a petition for writ of error coram nobis.  We will compare both standards to determine the appropriate application under Rule 33(a).

In *State v. Goswick*, our Supreme Court provided guidance to trial courts on how to evaluate claims of newly discovered evidence in a motion for new trial:

> In passing on a motion for a new trial for newly discovered evidence when (1) reasonable diligence has been shown, and (2) its materiality is evident and, therefore, *likely, as here, to change the result*, if produced and accepted by the jury, the granting of a new trial is a matter of right.

656 S.W.2d 355, 358-59 (Tenn. 1983) (emphasis added).  *See also Singleton*, 853 S.W.2d at496 ("It has long been recognized under Tennessee law that a trial court should grant a defendant a new trial on the basis of newly discovered evidence when the defendant has been reasonably diligent in obtaining evidence, the materiality of the new evidence is apparent, and the evidence is likely to change the result.").

Although there is substantial case law addressing the standard of review and burden of proof in coram nobis proceedings based on newly discovered evidence, coram nobis is a statutory remedy,[4] and the statute itself serves as the primary source of guidance.

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial, or unknown to the defendant at the time of plea, if the judge determines that such evidence *may have resulted in a different judgment*, had it been presented at the trial, or known at the time of plea.

T.C.A. § 40-26-105(b) (emphasis added).  In *Nunley v. State*, the Supreme Court held that for evidence to qualify as newly discovered in a coram nobis proceeding, the evidence must have existed but not have been ascertainable at the time of trial; it must be admissible and credible; and the party must explain why it could not have been discovered earlier through reasonable diligence.  552 S.W.3d 800, 816 (Tenn. 2018); *see also Clardy v. State*, 691

---

[4] The writ of coram nobis originated in English common law and became a statutory remedy in Tennessee criminal cases in 1955.  *See State v. Vasques*, 221 S.W.3d 514, 524-25 (Tenn. 2007); *see also Mixon v. State*, 983 S.W.2d 661, 666-68 (Tenn. 1991).

S.W.3d 390, 403 (Tenn. 2024) (reiterating the *Nunley* factors for a timely coram nobis petition on a claim of newly discovered evidence of actual innocence).

The burden of proof for analyzing newly discovered evidence in the context of a motion for new trial and in a coram nobis proceeding, while "comparable," is "slightly different." *State v. Vasques*, 221 S.W.3d 514, 525, n.3 (Tenn. 2007). This court recognized the difference in *State v. Workman*, 111 S.W.3d 10 (Tenn. Crim. App. 2002), a coram nobis case.[5] In *Workman*, this court examined the "may have" standard to ascertain its application and concluded that the "will likely change" language for a Rule 33(a) motion, was a higher standard than the "may have" language for a coram nobis petition:

> It is arguable that the "may have resulted in a different judgment" language should be viewed under the same standard as a motion for new trial based upon newly discovered evidence. The test in such a situation is whether the newly discovered evidence "will likely change the result of the trial." However, this appears on its face to be a higher standard than the "may have" language in the statute and the "might have" language used by our supreme court in *Mixon*. Furthermore, a lesser standard would appear to be more appropriate. . . .

111 S.W.3d at 18. Rather than use the "higher" standard required in a motion for new trial, this court concluded that the proper interpretation of "may have resulted in a different judgment" was the "reasonable probability" standard used in post-conviction proceedings to evaluate ineffective assistance of counsel claims. *Id.*

In *Vasques*, the Supreme Court acknowledged the different standards for newly discovered evidence in a motion for new trial as opposed to a coram nobis petition by quoting this court's decision in *Workman*. *Vasques*, 221 S.W.3d at 526 (citing *Workman*, 111 S.W.3d at 18). To "amplify" the standard established in *Mixon*[6] and confirmed by *Workman*, the Supreme Court in *Vasques* held that in a coram nobis proceeding, in determining whether newly discovered evidence may have led to a different result, the standard is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." *Id.* at 527. The court found that this interpretation struck "a balance" between the positions of the State and the defense.

---

[5] We cite this court's decision after the supreme court remanded the case for a coram nobis hearing. *Workman v. State*, 41 S.W.3d 100, 101 (Tenn. 2001) (summarizing the procedural history leading to the supreme court's decision to remand for a coram nobis hearing).

[6] 983 S.W.2d at 673, n.17 (affirming this court's enunciation of the three-part standard for newly discovered evidence).

*Vasques* and *Workman* make clear that more than "a reasonable basis" is required to justify a new trial under Rule 33(a). *Vasques*, 221 S.W.3d at 525-28; *Workman*, 111 S.W.3d at 18. For a motion for new trial under Rule 33, the defendant must establish that the newly discovered evidence would "likely . . . change the result" of the trial. *Vasques*, 221 S.W.3d at 525 n.3; *Caldwell*, 977 S.W.2d at 116-17; *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994). "The question is not what the jury might do, but, supposing all the evidence new and old to be before another jury, whether they *ought* to return a verdict more favorable to the defendant than the one returned on the original trial." *Goswick*, 656 S.W.2d at 359 (quoting *Evans v. State*, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977)) (emphasis added).

In addition to the differing burdens of proof between a motion for a new trial and a coram nobis petition, the coram nobis statute specifically contemplates circumstances where a claim could not have been raised in a motion for a new trial:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and *to matters that were not or could not have been litigated* on the trial of the case, *on a motion for a new trial*, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding.

T.C.A. § 40-26-105(b) (emphasis added). By distinguishing itself from other writs and post-trial motions, coram nobis presupposes that its unique standard and burden of proof apply exclusively within coram nobis proceedings, and not in any other context.

Thus, we conclude that the proper legal standard in considering a newly discovered evidence claim in a motion for new trial under Rule 33 is that newly discovered evidence is likely to change the result of the trial. *Goswick*, 656 S.W.2d at 358-60; *see also Nichols*, 877 S.W.2d at 737.

### III.    Abuse of Discretion

The final issue is whether the trial court abused its discretion by granting the motion for new trial. The State argues that the trial court's application of the coram nobis standard was an abuse of discretion. Defendant contends that the trial court did not abuse its discretion because the trial court's decision "fell within the spectrum of rulings that might reasonably result from the application of the proper standard."

In both Rule 33 and coram nobis proceedings, a trial court's decision to grant or deny a new trial based upon newly discovered evidence rests within the trial court's discretion. *Caldwell*, 977 S.W.2d at 117 (recognizing trial court's discretionary authority in a motion for new trial); *Vasques*, 221 S.W.3d at 527-28 (recognizing discretionary

- 16 -

authority in coram nobis petition). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Moore v. Lee*, 644 S.W.3d 59, 63 (Tenn. 2022) (internal citations and quotation marks omitted). Whether a court applied an incorrect legal standard is a question of law that is reviewed de novo. *Black v. Strada*, 721 S.W.3d 223, 226 (Tenn. 2025), *cert. denied*, 146 S. Ct. 59 (Aug. 4, 2025) (quoting *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020)). Questions of fact are reviewed de novo with a presumption of correctness unless the evidence preponderates otherwise. *Black*, 721 S.W.3d at 226 (citing Tenn. R. App. P. 13(d)).

Here, the trial court's factual findings hinged on the degrees to which Dr. Oliver's testimony differed from Dr. Mileusnic-Polchan's testimony regarding whether the victim remained conscious after the infliction of the injuries and whether she was bludgeoned by an instrument:

> This Court holds Defendant has met the burden in this matter to justify a new trial. As stated herein, the substitute expert, Dr. Mileusnic[-Polchan], testified in the strongest terms possible that the deceased, Ms. Presley, was rendered immediately unconscious and incapacitated upon receipt of her traumatic injuries until her death. Given that Defendant was found with the deceased within a small residence with apparent blood stains, this opinion of Dr. Mileusnic[-Polchan] completely contradicted Defendant's wholly unverified version of events as provided in a recorded interview with law enforcement. The testimony of [Dr. Mileusnic-Polchan] upon this issue completely gutted any ability of counsel to defend the case and to attempt to corroborate Defendant's theory as provided to law enforcement. Dr. Oliver, the original pathologist, testified that it is not anatomically or medically possible to determine how or when Ms. Presley was rendered unconscious or incapacitated from her injuries.

The trial court then concluded:

> While this Court cannot say this new evidence is "likely" to produce an acquittal or different outcome at a new trial, it certainly "may" alter the new trial to use the legal terminology included in binding case precedent. The Court finds that the new evidence also shakes the confidence and reliability of the existing trial conviction by jury.

Having concluded that the "is likely" or "would likely" standard of *Goswick* is the proper legal standard, in our de novo review, we further conclude that because the trial

- 17 -

court applied the incorrect legal standard in granting Defendant a new trial under Rule 33(a), it abused its discretion. *Moore*, 644 S.W.3d at 63.

Additionally, we cannot conclude that a jury would have returned a more favorable verdict with the inclusion of Dr. Oliver's testimony. *Evans*, 557 S.W.2d at 938 (stating "supposing all the evidence new and old to be before another jury, whether they ought to return a verdict more favorable . . . than the one returned on the original trial"). The trial court credited Dr. Oliver's testimony, and the evidence does not preponderate against the court's credibility finding. However, while Dr. Oliver's testimony that the victim was unlikely to have been injured by an object and might have remained conscious after the injury could have supported the defense theory, it would serve, at most, as limited impeachment of Dr. Mileusnic-Polchan's testimony rather than introduce new evidence on causation or another perpetrator's identity. Impeachment evidence is generally not a basis for a new trial, *State v. Sheffield*, 676 S.W.2d 542, 554 (Tenn. 1984), unless the impeaching evidence "is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal[.]" *Singleton*, 853 S.W.2d at 496.

Dr. Oliver actually agreed with Dr. Mileusnic-Polchan's opinion that the blunt force trauma to the victim's eyes could not be attributed to a fall – a point critical to the State's theory of intentional or knowing mens rea. And to the extent Dr. Oliver's opinion contradicted Dr. Mileusnic-Polchan's testimony regarding the mechanism of the injuries and victim's unconsciousness, such divergence of opinion did not undermine the findings on the number, location, identity, and severity of the victim's injuries, nor did it affect the cause of death and the manner of death or the photographic evidence admitted at trial. *Cf. State v. Burns*, 777 S.W.2d 355, 359-61 (Tenn. Crim. App. 1989) (reversing denial of motion for new trial where newly discovered evidence consisted of three inmates who testified that another inmate confessed to the crimes where eyewitness identification was crucial to the defendant's guilt). Unlike the case in *Burns*, Dr. Oliver's testimony did not undermine Defendant's guilt. The jury also heard expert testimony from Dr. Whittaker contradicting Dr. Mileusnic-Polchan on whether the victim could have remained conscious after the injuries were inflicted.

For these additional reasons, we conclude that the trial court abused its discretion in granting Defendant a new trial under Rule 33(a).

## CONCLUSION

Based on the foregoing reasons, the judgment of the trial court is reversed and the case is remanded to the trial court for entry of judgment on the jury's verdict. On remand, those issues raised by Defendant in his motion for new trial and amended motion for new

trial that were not addressed by the trial court, shall be addressed by the trial court according to the normal procedure for a motion for new trial, except for the *Brady* violation issue which was fully addressed and denied by the trial court.


s/**𝓙𝓲𝓵𝓵 𝓑𝓪𝓻𝓽𝓮𝓮 𝓐𝔂𝓮𝓻𝓼**
JILL BARTEE AYERS, JUDGE